

55 SECOND STREET, SUITE 1700, SAN FRANCISCO, CALIFORNIA 94105-3493
TELEPHONE (415) 227-0900 / FAX (415) 227-0770

File Number:G1957-002
Direct Dial Number: (415) 227-3655
Direct Facsimile Number: (415) 904-3121
E-Mail Address: *pbales@buchalter.com*

July 3, 2013

**VIA ECF FILING**

Hon. Laurel Beeler (Courtroom C)

Re:   *AMEC v. Geosyntec; et al.;* Case No. 12-CV-2973-TEH

**Joint Letter Brief: Defendant Geosyntec's Motion To Compel Against Plaintiff AMEC**

Your Honor:

Defendant Geosyntec and Plaintiff AMEC hereby submit this joint letter brief outlining the discovery issues that the parties were not able to resolve through their meet and confer efforts concerning AMEC's responses to Geosyntec's First Set of Interrogatories ("Interrogatories"). AMEC will also be filing a joint letter regarding its discovery requests, and has circulated a draft to Defendants. AMEC will file it as soon as it receives Defendants' response.

**Geosyntec's Summary of Case:** This is a trade secret misappropriation and unfair competition action between two companies in the environmental consulting industry: plaintiff AMEC Environment & Infrastructure, and defendant Geosyntec Consultants. Over the course of about 15 months in 2010 and 2011, 18 consultants (e.g., engineers, geologists, etc.) left AMEC to join Geosyntec. The present discovery dispute relates to AMEC's trade secret cause of action.

**Meet and Confer:** AMEC served responses to Geosyntec's Interrogatories on May 15, 2013. *See* Ex. A. On May 30, 2013, Geosyntec delivered its first meet and confer letter and AMEC responded with its letter on June 10. *See* Exs. B, C. On June 11, lead counsel met at Buchalter Nemer's offices for several hours in an effort to resolve the discovery issues. On June 14, Geosyntec sent an email to AMEC summarizing the issued that remained following the in-person meeting and AMEC responded on June 19. Ex. D.[1]

**Interrogatory No. 1:** "For each trade secret identified in the DESIGNATION, state whether it was a formula, pattern, compilation, program, device, technique, process, or some other type of information."

**Response to Interrogatory No. 1**: AMEC's response to Interrogatory No. 1 was five pages long. To fit within the Court's page limit, the parties have attached AMEC's responses as Exhibit A, and incorporate them by reference.

**Geosyntec's Position**: Trade secrets are defined by the California Uniform Trade Secrets

---

[1] AMEC agreed to provide supplemental responses to Interrogatories Nos. 3 and 5 and Document Requests Nos. 38 through 42. The parties hope to resolve those issues without involving the Court.

BuchalterNemer

Hon. Laurel Beeler
July 3, 2013
Page 2

Act, Cal. Civil Code Section 3426.1(d). In order to prevail at trial, AMEC will have to prove –
for each purported trade secret – that it is a "formula, pattern, compilation, program, device,
technique, process, or some other type of information" that is entitled to trade secret protection.
*See, O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1072–75 (N.D.Cal.
2005) (A plaintiff asserting a trade secret claim bears the burden of proving each element of the
claim "as to each claimed trade secret."). This interrogatory asks a simple question with respect
to each of the alleged trade secrets: which *type* of information is it? The information requested is
not just relevant; it is a required element of AMEC's trade secret cause of action.

In its response, AMEC: (1) refers to and incorporates its trade secret designation, and (2)
that the alleged trade secrets all fall into one of the broad categories of trade secrets described in
its complaint. The balance of the response is a "cut and paste" of several pages from the
complaint describing, in general terms, those trade secret categories. AMEC claims it would be
unduly burdensome to provide the requested information for each individual trade secret. This is
not an adequate response.

AMEC's designation of trade secrets ("Designation") is 86 pages long and identifies 387
allegedly misappropriated trade secrets. Each trade secret is identified by a range of Bates
numbers, the project to which it relates, and a brief description of the document, e.g., "Summary
updates to the EPA for the subject site," and "Email attaching plant layout for the project."
Almost without exception, the 387 alleged trade secrets are documents and communications
found in the project files from about half a dozen consulting projects. Many of those projects –
and the related project files – were ultimately transferred from AMEC to Geosyntec at the
request of the clients. AMEC contends that the Designation adequately provides the information
requested by Interrogatory No. 1. It does not. While the Designation does identify the
documents at issue (sufficiently to clear the C.C.P. 2019.210 hurdle), it provides *no* information
about other critical aspects of those alleged trade secrets. It does not state which information
within each document is allegedly valuable and secret, it does not describe what kind of
information it is (formula, compilation, etc.), it does not describe the "independent economic
value" derived from the information, or the efforts by AMEC to keep the information secret.

Nor does AMEC's response that each of the trade secrets falls into one of five broad
categories of trade secrets alleged in the complaint provide the requested information.
Geosyntec is entitled to know – *for each of the purported trade secrets* – what kind of protected
information AMEC claims it is (and, as explained in the section addressing Interrogatory No. 2,
the economic value it derives from being secret). AMEC cannot avoid its obligation to provide
this information with generalized responses and quotes from its complaint. *See Hawn v.
Shoreline Towers Phase I Condo. Ass'n, Inc.*, 2007 WL 2298009, *7 (N.D. Fla. 2007)
("Plaintiff's verbatim copying of paragraphs contained in the complaint is no more effective an
answer to [the interrogatory] than [plaintiff's] bare citation to the complaint. [The interrogatory]
seeks further information about the facts underlying Plaintiff's allegations, not a second recitation
of the complaint."). In short, AMEC cannot, in equity and good faith, identify 387 purportedly
misappropriated trade secrets, and then refuse to provide fundamental facts regarding their
existence on the grounds that it would be a lot of work. *See, FormFactor, Inc. v. Micro–Probe,
Inc.*, 2012 WL 2061520, at * 5 (N.D.Cal. June 7, 2012) (finding that a 499 page list of trade

BuchalterNemer

Hon. Laurel Beeler
July 3, 2013
Page 3

secrets failed to "identify what each individual thing is that is alleged to be a trade secret").

   **AMEC's Position:**  Although this interrogatory is objectionable for the reasons set forth below, AMEC has nonetheless adequately identified whether its trade secrets are "a formula, pattern, compilation, program, device, technique, process, or some other type of information." As AMEC made clear in meet and confer correspondence, AMEC's trade secrets are "other information" and "compilations" as set forth in detail in its Amended Designation.  Defendants took thousands of documents from project files for AMEC clients with which Defendants interfered.  The project files consist of thousands of pages of data and analysis on environmental remediation of client sites and include lab reports, field notes, budgeting information, proposals, contracts, and other files, all of which is specifically identified by project, description and Bates-number in AMEC's Amended Designation.  AMEC also specifically identified the project files as compilations, which are separately protectable under Civil Code § 3426.1(d).  Geosyntec already agreed AMEC satisfied the "reasonable particularity" standard of Civ. Proc. Code § 2019.210 after AMEC amended its designation at Geosyntec's request.  Geosyntec now wants more, but fails to make clear what it seeks.  To the extent it seeks more "for more's sake," it smacks of make-work done for no other purposes than to cause needless expense.  Defendants are intimately aware of every detail of the project files because the individual defendants helped create these documents.  Nevertheless, AMEC has gone to great efforts to specifically identify the nature of the alleged trade secrets.  Defendants know that environmental consulting project documents do not "fit" squarely into the "formula, pattern...program..." mold and it is for this reason they seek AMEC to spin wheels and wedge all such project and financial documents into ill-suited denominations.  For this proposition, Defendants cite no cases (and AMEC has found none) forcing a plaintiff to categorize one's trade secrets in the manner sought by Defendants. Further categorization would only result in unnecessary time and expense.

   AMEC's descriptions are entirely adequate and supported by caselaw.  The cases to which Geosyntec cited in meet and confer correspondence make clear the categories set forth in Civil Code § 3426.1(d) are illustrative rather than restrictive.  *Agency Solutions.com LLC v. Trizette Group, Inc.*, 819 F. Supp. 2d 1001, 1016 (E.D. Cal. 2011) ("the case authority the court has reviewed appears to use the statutory categories of things that may constitute a trade secret ...as illustrative rather than restrictive.").  *In Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443 (2002), the court held categories of trade secrets—including, pricing of products, profit margins, production costs, pricing concessions, rebates, payment terms, market research, advertising strategy, rebate incentives, budgets, finishing processes, and strategic plan documents—were defined with sufficient particularity.  In *San Jose Constr., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1538 (2007), the court held plaintiff was entitled to protection over project binders that included information similar to that over which AMEC contends constitute its trade secrets here.

   To the extent Geosyntec requests AMEC to separately identify information about each document in the designation on a document-by-document basis it violates Rule 33, which limits a party to 25 interrogatories because it renders the interrogatory as calling for a response to hundreds of subparts.  *See Dura Global, Technologies, Inc. v. Magna Donnelly Corp.*, 2008 WL 3889735, at *2 (E.D. Mich. Aug. 18, 2008) (by "requesting information regarding each document produced by Plaintiffs" the interrogatories impermissibly sought "hundreds if not

BuchalterNemer

Hon. Laurel Beeler
July 3, 2013
Page 4

thousands of discrete pieces of information."). Moreover, Geosyntec asks AMEC to opine on the statutory language of Civil Code Section 3426.1(d), which is improper. *See Weddington v. Consolidated Rail Corp.*, 101 F.R.D. 71, 75 (N.D. Ind. 1984) (legal argumentation is the proper subject of briefing, but not Rule 33 interrogatories); *Schaap v. Executive Indus., Inc.*, 130 F.R.D. 384, 388 (N.D. Ill. 1990) (same).

The cases cited by Defendants are inaccurately cited and inapposite. Both cases were patent infringement cases involving complex products, not project files. Nowhere in *O2 Micro* does the court state a plaintiff bears the burden of proving each element of its claim "as to each claimed trade secret," as Geosyntec claims. *O2 Micro* Court involved a post-trial motion with a *heightened* burden for plaintiff that is not at issue here where discovery only commenced at the end of March. *O2 Micro Int'l Ltd.*, 399 F.Supp.2d at 1072. *FormFactor* was based on Civ. Proc. Code § 2019.210's statutory predecessor, which by Geosyntec's own account, AMEC has already satisfied. *FormFactor, Inc.*, 2012 WL 2061520, at * 6.

**Interrogatory No. 2:** "For each trade secret identified in the DESIGNATION, describe the independent economic value it had and/or has because it was secret."

**Response to Interrogatory No. 2:** AMEC's response was two pages long. The parties have attached the responses as Exhibit A, and incorporate them by reference.

**Geosyntec's Position:** "To establish independent value, a plaintiff must show that the trade secret is 'sufficiently valuable and secret to afford an actual or potential economic advantage over others' who do not possess the information." *See, FormFactor, Inc.* * 7; *citing Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal.App.4th 547, 564 (2007). Plaintiff again objects to the interrogatory on the grounds of undue burden, refers to its Designation, and provides only a generalized, argumentative response lacking any facts reflecting the purported economic value of each trade secret. The requested information is a required element of a trade secret cause of action (*see* CACI 4402, 4412), and is critical to Geosyntec's analysis and defense of this action. In order to prevail at trial, AMEC must present evidence of the independent economic value of each alleged trade secret; it cannot refuse to disclose that very evidence during discovery on the grounds it would be burdensome. If it cannot describe the independent economic value of each trade secret, it must say so. But it may not avoid the issue altogether.

**AMEC's Position:** AMEC's sufficiently identified the independent economic value of its trade secrets. As the *San Jose Construction* Court made clear, "We can readily infer .... that the information contained in SJC's project binders, viewed as a whole, derived economic value from being kept a secret from competitors such as South Bay. As SJC describes it, 'only SJC had completed the puzzle for each project, contained in the binders." *San Jose Constr.*, 155 Cal.App.4th 1528 at 1539; *see also Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514 (1997); *ReadyLink Healthcare v. Cotton*, 126 Cal.App.4th 1006 (2005). The same is true here, and AMEC made this clear in response to Interrogatory No. 2. To the extent Geosyntec seeks information about damages—which it plainly is doing—it is premature as that will be the subject of expert reports and testimony. "[I]nterrogatories may not be served at a time that will require response in advance of the time set for expert discovery by the court or by Rule 26(a)(2)." 7

BuchalterNemer

Hon. Laurel Beeler
July 3, 2013
Page 5

James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 33.71 (3d ed. 2006); *see also B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y.*, 168 F.R.D. 161, 166 (S.D.N.Y. 1996) (answers to interrogatories regarding the scope of expert's testimony not required until expert report). Until the time set for expert discovery, experts opinions and work are privileged under the work product doctrine. *See FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1044 (E.D. Cal. 2002). Pursuant to Judge Henderson's Order for Pretrial Preparation in this case, Plaintiff is not required to disclose even the identity of its experts (much less reports) until January 3, 2014.

**Interrogatory No. 6:** "For each trade secret identified in the DESIGNATION, state all facts supporting YOU contention that its misappropriation caused YOU harm."

**Response to Interrogatory No. 6:** The parties have attached the responses as Exhibit A, and incorporate them by reference.

**Geosyntec's Position:** "The final requirement to establish misappropriation of trade secrets is to show that the alleged misappropriation caused damage to the plaintiff." *FormFactor, Inc.* \* 13 (citations omitted). AMEC claims that "the actual calculation of all such damages and the harm suffered to AMEC will be the subject of further discovery." However, Interrogatory No. 6 does not ask Plaintiff to quantify its harm; it seeks facts supporting AMEC's contention that the alleged misappropriation of each trade secret *caused* some harm (i.e. did AMEC lose a client because of trade secret X? Did it lose a particular project because of trade secret Y?). Geosyntec is entitled to a verified response identifying any facts supporting AMEC's allegation that it was harmed by the misappropriation of each trade secret at issue.

**AMEC's Position:** AMEC sufficiently described the harm it suffered due to the misappropriation of its trade secrets. Namely, Defendants used AMEC's own project files for the particular projects to beat its competition, AMEC, by taking those projects from AMEC. Defendants used specific documents and information about AMEC's rates and budgets, as well as detailed site information—all of which is specifically identified by project, description and Bates number in the Amended Designation—to take those clients and projects. Geosyntec now demands AMEC list, for each item in the Designation, the harm that taking the document caused AMEC, which is mere make-work and, to the extent Geosyntec so interprets the request, would result in hundreds of subparts in violation of Rule 33. *See Dura Global, Technologies, Inc.*, 2008 WL 3889735, at *2. Moreover, many of the facts surrounding AMEC's damages are solely in defendants' hands and will be the subject of discovery. AMEC begins deposing the first of many of its former employees on July 11 and these depositions will continue through late 2013. Facts surrounding the harm AMEC suffered may well be based on the extent to which Geosyntec was unjustly enriched by using AMEC's documents to take its clients and projects. This information will be forthcoming in documents to be produced by Defendants, but not in the possession of AMEC. In addition, AMEC has requested and awaits approval by defendants on independent forensic review of all computers/electronic devices onto which AMEC's trade secret and confidential materials were transferred, which will also provide facts related to defendants' use of those documents and the harm AMEC has suffered. To the extent Geosyntec seeks information on damages, such information will be the subject of expert reports and testimony and is therefore premature for the reasons set forth above.

BuchalterNemer

Hon. Laurel Beeler
July 3, 2013
Page 6

Respectfully,

BUCHALTER NEMER
A Professional Corporation


By      /s/ Richard Darwin

        Richard Darwin Counsel for Defendants


CARROLL, BURDICK & MCDONOUGH
LLP


By      /s/ Matthew Miller

        Matthew Miller Counsel for Plaintiff

# EXHIBIT A

1    Matthew F. Miller, No. 172661
     Jack T. Friedman, No. 068134
2    Robert J. Nolan, No. 235738
     **CARROLL, BURDICK & McDONOUGH LLP**
3    Attorneys at Law
     44 Montgomery Street, Suite 400
4    San Francisco, California 94104
     Telephone:      415.989.5900
5    Facsimile:      415.989.0932
     Email:          mmiller@cbmlaw.com
6                    jfriedman@cbmlaw.com
                     rnolan@cbmlaw.com
7
     Attorneys for Plaintiff
8    AMEC ENVIRONMENT & INFRASTRUCTURE, INC.

9                        UNITED STATES DISTRICT COURT

10                      NORTHERN DISTRICT OF CALIFORNIA

11                          SAN FRANCISCO DIVISION

12

13   AMEC ENVIRONMENT &                    No. C 12-cv-2973-TEH
     INFRASTRUCTURE, INC.,
14                                         **PLAINTIFF AMEC ENVIRONMENT &
                                           INFRASTRUCTURE, INC.'S OBJECTIONS AND
15          Plaintiff,                     RESPONSES TO DEFENDANT GEOSYNTEC'S
                                           FIRST SET OF INTERROGATORIES**
     v.
16
     GEOSYNTEC CONSULTANTS, INC.,
17   et al.,

18          Defendants.

19

20   PROPOUNDING PARTY:      DEFENDANT GEOSYNTEC CONSULTANTS, INC.

21   RESPONDING PARTY:       PLAINTIFF AMEC ENVIRONMENT & INFRASTRUCTURE, INC.

22   SET NO.:                ONE

23

24          Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff AMEC

25   Environment and Infrastructure, Inc. ("AMEC") hereby provides the following responses and

26   objections to the First Set of Interrogatories (the "Interrogatories") of Defendant Geosyntec

27   Consultants, Inc. ("Geosyntec").

28

CBM-SF\SF583807

PLAINTIFF AMEC'S OBJECTIONS AND RESPONSES TO INTERROGATORIES, SET ONE      (CASE NO. C 12-CV-2973-TEH)

**GENERAL OBJECTIONS**

1.      AMEC objects to the Interrogatories (including the Definitions and Instructions) to the extent they seek to impose upon AMEC obligations greater than those imposed by the Federal Rules of Civil Procedure and will respond in conformity with the Federal Rules.  In particular, AMEC objects to the definition of the term "YOU," "YOUR" and "AMEC" as overbroad and unduly burdensome, particularly to the extent it results in any interrogatory seeking information that is not within the possession, custody or control of AMEC Environment & Infrastructure, Inc. AMEC interprets the interrogatories to seek information from AMEC Environment & Infrastructure, Inc. and will respond accordingly.  AMEC further objects to the definition of PERSON as overbroad.

2.      AMEC objects to the Interrogatories to the extent they call for information that is publicly available or readily accessible to Defendants, or that would otherwise be less burdensome for Defendants to obtain than AMEC.

3.      AMEC objects to the Interrogatories insofar as they seek information that is protected from discovery by any applicable privilege, doctrine or immunity, including without limitation the attorney-client privilege and the work-product doctrine, and information that is subject to the right of privacy guaranteed by the constitutional, statutory, or decisional law of the United States, the State of California and all other relevant jurisdictions. Inadvertent disclosure of any information subject to any applicable privilege or doctrine, including but not limited to the attorney-client privilege and the attorney work-product doctrine, is not intended to be, and shall not operate as, a waiver of any such privilege or doctrine in whole or in part; nor is any such inadvertent disclosure intended to be, nor shall it constitute, a waiver of the right to object to any use of such document, or of the information contained therein.

4.      Some responses may be responsive to more than one interrogatory.  Whenever information is furnished in response to one interrogatory, that information also is being furnished in response to other pertinent interrogatories.

5.      AMEC objects to the Interrogatories to the extent they require the production of documents.  AMEC will produce documents in accordance with the schedule agreed upon by the

PLAINTIFF AMEC'S OBJECTIONS AND RESPONSES TO INTERROGATORIES, SET ONE    (CASE NO. C 12-CV-2973-TEH)

1    parties and approved by the Court. To the extent that these Interrogatories request AMEC to

2    identify, index, summarize, or describe the contents of the documents which will be produced,

3    AMEC objects to those requests because they are unreasonably cumulative and duplicative, and

4    because such information can be obtained in a more convenient, less burdensome, and less

5    expensive manner by simply viewing the documents themselves.

6          6.      AMEC objects to the Interrogatories to the extent they seek confidential,

7    proprietary, financial, technical or trade secret information of AMEC or its clients or former

8    clients. AMEC expressly reserves the right to seek protections and safeguards to prevent the

9    disclosure of such confidential information. In particular, to the extent AMEC is under

10    contractual obligations not to disclose certain client information for specific clients for which

11    Geosyntec has requested client information AMEC will not disclose such client information

12    without first obtaining protections sufficient to comply with such contractual obligations as

13    required by the terms of those contracts.

14          7.      Each of the specific responses that follow are made subject to, and without waiver

15    of all objections as to competence, relevancy, materiality, propriety, and admissibility, and any

16    and all other objections and grounds which would require the exclusion of any statements and/or

17    documents referenced herein if made by or offered through a witness present and testifying in

18    court. All such objections and grounds are hereby reserved and may be interposed at the time of

19    trial.

20          8.      Discovery in this case has only recently begun. AMEC responds to each

21    Interrogatory to the best of its present knowledge and reserves the right to supplement its

22    responses to these Interrogatories based on new or additional information.

23          9.      AMEC hereby incorporates each of the foregoing General Objections into the

24    specific responses that follow, as if fully set forth therein. AMEC's responses are expressly made

25    subject to these General Objections.

26

27

28

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:**

For each trade secret identified in the DESIGNATION, state whether it is a formula, pattern, compilation, program, device, method, technique, process, or some other type of information.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to its General Objections, which are incorporated by reference, AMEC objects to this interrogatory on the ground that it calls for legal conclusions. AMEC further objects to this interrogatory to on the ground that the terms "formula," "pattern," "compilation," "program," device," "method," "technique" and "process" are vague an ambiguous insofar as they are not defined either by Defendant or statute. AMEC further objects to the phrase "or some other type of information" as vague and ambiguous. Preparation of a document-by-document response with respect to each individual document in the Amended Designation would be unduly burdensome to AMEC and AMEC objects to this interrogatory on the basis of such burden and expense.

Subject to and without waiving its General and Specific Objections, AMEC responds that it has specifically identified its trade secrets in the Amended Designation of Trade Secrets served on March 20, 2013 ("Amended Designation"), which is hereby incorporated by reference. In particular, AMEC has identified those items that are individually protectable trade secrets, and which fall within the specific categories of trade secrets identified in the First Amended Complaint. Those trade secrets constitute AMEC's client lists and customer information, client site information, qualifications and proposals, billing rates and multipliers, project budgeting information, including costs, historical pricing information and business plans and strategies, as set forth in detail in the First Amended Complaint and below. The information in the Amended Designation is specifically identified by project and specifically notes both those documents that are individually protectable trade secrets and those for which AMEC has identified compilations of documents by project that also constitute protectable trade secrets. Each trade secret specifically falls into each of the categories identified herein and in the First Amended Complaint and is protectable as a trade secret within the meaning of California Civil Code section 3426.1.

1   The documents are readily identifiable on their face as falling into one or more of the subject
2   categories and Defendants have copies of each of the documents identified in the Amended
3   Designation and have produced them to AMEC.  More particularly, AMEC has specified those
4   specific categories into which its trade secrets fall, as follows:

5   **AMEC's Client Lists and Customer Information**

6        AMEC and its employees maintain lists of its current and past clients ("AMEC's Client
7   Lists and Customer Information").  AMEC's Client Lists and Customer Information are not
8   publically known, derive significant economic value to AMEC from their secrecy, and are subject
9   to reasonable efforts to maintain their secrecy.

10        AMEC's Client Lists and Customer Information include information regarding contact
11   information for key decision makers for each client and information regarding current, past, and
12   prospective projects for each of AMEC's clients.  AMEC's Client Lists and Customer
13   Information provide AMEC with a substantial competitive advantage over its competitors who do
14   not have this information and who do not know the quantity and quality of information
15   maintained by AMEC.

16   **AMEC's Client Site Information**

17        AMEC works with clients in highly regulated industries who must comply with numerous
18   federal and state statutes and regulations.  AMEC offers a wide variety of Services throughout the
19   United States and globally.  In providing these Services, AMEC gains specific and highly
20   sensitive information about the properties, sites, and businesses of the clients for whom AMEC
21   provides the Services ("AMEC's Client Site Information").  For example, AMEC, on behalf of
22   many of its clients, conducts site assessments and evaluations to determine the characteristics of
23   the site and whether a site is in compliance with statutes and regulations.  If not, AMEC provides
24   recommendations, tailor-made solutions, and proposed designs for bringing the site back into
25   compliance, which is known as site "closure" or remediation information.  ("Closure
26   Information").

27        AMEC's Client Site Information and Closure Information combine the technical expertise
28   of AMEC's professionals with AMEC's considerable industry-specific knowledge, and AMEC's

CBM-SF\SF583807                                        -5-

1   knowledge of each site's specific characteristics, to provide a specific, tailored, and highly

2   proprietary plan for each of AMEC's clients' sites.  The knowledge that AMEC project team

3   members gain about each site's characteristics is subject to non-disclosure obligations in favor of

4   AMEC's clients.  In many instances, AMEC's clients contractually obligate project team

5   members to refrain from all disclosure of site-specific information outside of the AMEC project

6   team.

7            AMEC's site evaluation and closure information is highly confidential and is maintained

8   under strict non-disclosure agreements between AMEC and its clients.  AMEC's clients often

9   preclude any public or marketing-related disclosures regarding client sites or the work performed

10  upon them.

11           Site evaluation and closure information derives significant economic value to AMEC from

12  being not generally known and is subject to AMEC's reasonable efforts to maintain its secrecy.

13  Maintaining the confidentiality of AMEC's site evaluation and closure information provides

14  AMEC with a significant advantage over its competitors when AMEC's clients open bidding for

15  closure of a site.

16  **AMEC's Qualifications and Proposals**

17           Companies seeking bids or proposals for AMEC's Services typically require a technical

18  proposal ("Proposal"), including a cost estimate for the project, which is based on the technical

19  solutions offered, and a set of detailed qualifications consisting of similar or representative

20  projects that AMEC has completed on behalf of its clients ("Qualifications") that result in

21  Proposal information and Qualifications specific to AMEC.

22           AMEC typically submits Proposals that include a set of technical options designed

23  specifically to address the client's problem.  The Proposals contain methods, techniques,

24  knowledge, and designs that are unique to the way in which AMEC approaches its business.

25           AMEC Qualifications contain detailed information about the nature and scope of its past

26  projects and are used for purposes of identifying similar projects when AMEC has an opportunity

27  to submit bids or Proposals on new projects.  AMEC's Qualifications are confidential and

28  proprietary, include information regarding how AMEC has successfully implemented strategies in

CBM-SF\SF583807                                     -6-

1    the past, and document AMEC's ability to perform Services requested by AMEC's client. Often,

2    AMEC's clients contractually restrict the specificity with which AMEC may disclose certain site-

3    specific information within its Qualifications. This information combines AMEC's knowledge of

4    past projects with AMEC's specific scientific and technical expertise to provide AMEC a

5    competitive advantage with its Proposals and in the bidding process.

6        AMEC's Qualifications and Proposals derive significant economic value to AMEC from

7    being not generally known and the Qualifications and Proposals are subject to reasonable efforts

8    to maintain their confidentiality.

9    **AMEC's Billing Rates and Multiplier, Project Budgeting Information, Including Costs, and**

10    **Historical Project Financial Information**

11        When submitting Proposals for a project, AMEC determines the estimated costs for the

12    Services by applying AMEC's rates for each of its professionals against a "multiplier" for that

13    client that is based on factors such as, among others, the complexity of the work, the type of

14    Services to be provided, the expected amount of time to complete the project, and AMEC's

15    history and relationship with that specific client ("Billing Rates and Multipliers"). AMEC

16    therefore develops a unique multiplier for each client. In addition, AMEC has project budgeting

17    information, including internal and external costs, as well as historical financial information

18    regarding clients and projects, which are confidential to AMEC.

19        AMEC's rates, AMEC's methodology for determining the multiplier for each client,

20    AMEC's internal practices for staffing each client project (based on level of expertise,

21    experience, and billing rates), AMEC's project budgeting information, including costs, and

22    AMEC's historical financial information regarding projects and clients constitute confidential and

23    proprietary information that derives significant economic value to AMEC from being not

24    generally known.

25        AMEC's unique multiplier methodology, AMEC's internal practices for staffing each

26    client project, AMEC's project budgeting information, including costs, and AMEC's historical

27    financial information regarding projects and clients allow AMEC to submit competitive bids on a

28

1   wide variety of potential projects, and these confidential practices are thereby integral to AMEC's

2   business strategy, competitiveness, and profitability in its industry.

3        AMEC's unique multiplier methodology, AMEC's billing rates, AMEC's internal

4   practices for staffing each client project, project budgeting information, including costs, and

5   historical financial information regarding client and projects are subject to reasonable efforts to

6   maintain their secrecy.

7        The disclosure to AMEC's competitors of AMEC's billing rates, AMEC's unique

8   multiplier methodology, AMEC's internal practices for staffing each client project, project

9   budgeting information, including costs, and historical financial information regarding clients and

10  projects would cause significant economic and competitive harm to AMEC.

11  **AMEC's Business Plans and Strategies**

12       AMEC's trade secrets include its business plans and strategies for business development

13  efforts with current and prospective clients ("Business Plans"). This includes specific

14  information regarding current and prospective clients' projects or potential projects regarding

15  particular sites, including those set forth in detail herein.

16       AMEC's Business Plans and strategies for business development efforts with current and

17  prospective clients constitute confidential and proprietary information that derives significant

18  economic value to AMEC from being not generally known.

19       AMEC's Business Plans and strategies for business development efforts with current and

20  prospective clients are subject to reasonable efforts to maintain their secrecy.

21       The disclosure to AMEC's competitors of Business Plans and strategies for business

22  development efforts with current and prospective clients would cause significant economic and

23  competitive harm to AMEC.

24       Additionally, AMEC's Client Lists and Customer Information, Client Site Information,

25  Qualifications and Proposals, Billing Rates and Multiplier Information and Business Plans

26  constitute confidential and proprietary information protected by the contractual duties entered into

27  by AMEC's employees, who agreed not to disclose such information to any third party, including

28  Defendant Geosyntec, or to use such confidential information after their departure from AMEC.

1    AMEC's Client Lists and Customer Information, Client Site Information, Qualifications

2    and Proposals, Billing Rates and Multiplier Information and Business Plans and Strategies

3    constitute AMEC's trade secrets, confidential and proprietary information whether or not

4    memorialized or retained in documents, contained in the employee's memory or otherwise stored

5    or recorded.  AMEC expressly reserves the right to supplement this response as new information

6    becomes available.

7    **INTERROGATORY NO. 2:**

8        For each trade secret identified in the DESIGNATION, describe the independent economic

9    value it had and/or has because it was secret.

10   **RESPONSE TO INTERROGATORY NO. 2:**

11       In addition to its General Objections, which are incorporated by reference, AMEC objects

12   to this interrogatory on the ground that it calls for a legal conclusion.  AMEC further objects to

13   the interrogatory insofar as AMEC has identified compilations of documents that constitute its

14   trade secrets, which, although certain of the documents may have been made available to the

15   public are nonetheless protectable compilations.  Preparation of a document-by-document

16   response detailing the independent economic value of each individual document in the Amended

17   Designation would be unduly burdensome to AMEC and AMEC objects to this interrogatory on

18   the basis of such burden and expense.  Subject to and without waiving these objections, AMEC

19   responds as follows:

20       The documents identified in the Amended Designation contain detailed information

21   regarding specific projects, as identified in the Amended Designation, concerning AMEC's client

22   lists and customer information, client site information, qualifications and proposals, billing rates

23   and multipliers, project budgeting information, including costs, historical pricing information and

24   business plans and strategies.  These documents could be and, AMEC is informed and believes

25   that the documents were in fact used by Defendants, including Geosyntec, which is a direct

26   competitor of AMEC, to unfairly compete with AMEC by interfering with ongoing and

27   prospective projects for AMEC clients.

28

1    AMEC—and its predecessor Geomatrix—expended significant resources and thousands of

2    hours in collecting, preparing and developing the information contained in the project files for the

3    subject projects.  The project files were a valuable asset that contained detailed information

4    concerning the projects, including, descriptions of the scope of work for each project, budget

5    proposals based on a review of numerous documents concerning the subject sites, proposals and

6    budgets from subcontractors concerning the work to be performed, reports and draft reports

7    concerning the projects, and numerous other files, all set forth in detail in the Amended

8    Designation.  The information contained in the project files, viewed as a whole, derived economic

9    value from being kept secret from competitors such as Geosyntec.  Only AMEC had a complete

10   "picture" or "puzzle" for each project contained in the project files, and no third party (or even

11   client) had the entire project files, which would have enabled AMEC to complete the work on the

12   subject projects and to continue to work with the client on future and/or follow-on work with

13   those clients.  Those project files were valuable to AMEC and derived independent economic

14   value from not being shared with direct competitors, such as Geosyntec.  Indeed, if competitors

15   such as Geosyntec had access to such information, it would allow those competitors to interfere

16   with AMEC's contractual relationship with its clients, by enabling the competitor to unfairly

17   compete with AMEC by using the information contained in the project files to obtain or to

18   attempt to obtain work on the subject projects and with the subject clients.  Further, such

19   information could be used as background resource material, formats, templates and preferred

20   methodologies and procedures by Defendants, including Geosyntec, in performance of even

21   unrelated project work.  Further, even were Defendants, including Geosyntec, to seek to obtain

22   any publicly-filed constituent documents with AMEC's Amended Designation, such efforts

23   would be time-consuming, prolonged and at expense to Defendants and only result in incomplete

24   project knowledge.  AMEC is informed and believes that Defendants, including Geosyntec, did in

25   fact use the trade secrets identified in the Amended Designation to unfairly compete with AMEC

26   to obtain clients and projects, resulting in direct damages to AMEC in the form of significant lost

27   revenue.

28

1    **INTERROGATORY NO. 3:**

2       For each trade secret identified in the DESIGNATION, describe the efforts YOU took to

3    keep it secret.

4    **RESPONSE TO INTERROGATORY NO. 3:**

5       In addition to its General Objections, which are incorporated by reference, AMEC objects

6    to this interrogatory on the ground that it is overbroad and unduly burdensome insofar as it

7    requests AMEC to describe all efforts taken to keep each of the hundreds of documents identified

8    in the Amended Designation confidential. Preparation of a document-by-document response

9    detailing every effort to retain each individual document identified in the Amended Designation

10   would be unduly burdensome to AMEC and AMEC objects to this interrogatory on the basis of

11   such burden and expense. Subject to and without waiving these objections, AMEC responds as

12   follows:

13       AMEC took numerous steps to ensure the confidentiality of its files. In particular, all or

14   substantially all of the Raided Employees (as that term is defined in the First Amended

15   Complaint), including the individual defendants, executed confidentiality agreements expressly in

16   favor of AMEC, which prohibited the employees from making unauthorized copies of any of

17   AMEC's secrets or proprietary, company confidential information without the consent of AMEC,

18   prohibited the removal of any business secrets or information from AMEC, and required the

19   return of confidential information immediately upon termination of employment.

20       For example, in connection with Ravi Arulanantham's employment with AMEC, on or

21   about May 12, 2008, Arulanantham signed an Agreement to Protect Confidential Information,

22   Assign Inventions, and Prevent Unfair Competition and Solicitation (Arulanantham's

23   "Confidentiality Agreement"). Arulanantham's Confidentiality Agreement defines "Confidential

24   Information" as "all nonpublic information (whether in paper or electronic form, or contained in

25   the Employee's memory, or otherwise stored or recorded) relating to or arising from AMEC's

26   business, including, without limitation, trade secrets used, develop[ed] or acquired by AMEC

27   (including in connection with the Merger) in connection with its business." "Confidential

28   Information" specifically includes "all information concerning the manner and details of AMEC's

1    operation, organization and management; financial information and/or documents and policies,

2    procedures and other printed, written or electronic material generated or used in connection with

3    AMEC's business; AMEC's business plans and strategies; the identities of AMEC's customers

4    and the specific customer representatives with whom AMEC works; the details of AMEC's

5    relationship with such customers and customer representatives, the identities of distributors,

6    contractors and vendors utilized in AMEC's business, the details of AMEC's relationships with

7    such distributors, contractors and vendors; the nature of fees and charges made to AMEC's

8    customers, forms, contracts and other documents used in AMEC's business; all information

9    concerning AMEC's employees, agents and contractors, including without limitation such

10   person's compensation, benefits, skills, abilities, experience, knowledge and shortcomings, if any;

11   the nature and content of computer software used in AMEC's business, whether proprietary to

12   AMEC or used by AMEC under license from a third party; and all other information concerning

13   AMEC's concepts, prospects, customers, employees, agents, contractors, earnings, products,

14   services, equipment, systems, and/or prospective and executed contracts and other business

15   arrangements."

16        Arulanantham's Confidentiality Agreement provides, in pertinent part, that "[e]xcept in

17   connection with and in furtherance of [Arulanantham's] work on AMEC's behalf,

18   [Arulanantham] shall not, without AMEC's prior written consent, at any time, directly or

19   indirectly: (i) use any Confidential Information for any purpose or (ii) disclose or otherwise

20   communicate any Confidential Information to any person or entity."

21        Arulanantham's Confidentiality Agreement further provides that "unauthorized disclosure

22   of Confidential Information will damage AMEC's business; that Confidential Information would

23   be susceptible to immediate competitive application by a competitor of AMEC's; that AMEC's

24   business is substantially dependent on access to and the continuing secrecy of Confidential

25   Information; that Confidential Information is novel, unique to AMEC and known only to

26   [Arulanantham], AMEC and certain key employees and contractors of AMEC; that AMEC shall

27   at all times retain ownership and control of all Confidential Information; and that the restrictions

28

1   contained in the Agreement are reasonable and necessary for the protection of AMEC's legitimate

2   business interests."

3       Arulanantham's Confidentiality Agreement also provides that "[u]pon termination of

4   [Arulanantham's] employment with AMEC, or upon AMEC's request, Employee shall

5   immediately deliver to AMEC or its designee (and shall not keep in [Arulanantham's] possession

6   or deliver to any other person or entity) all Confidential Records and all other AMEC property in

7   [Arulanantham's] possession or control."

8       Similarly, in connection with his employment by AMEC, Robert Cheung signed a

9   Confidentiality Agreement (Cheung's "Confidentiality Agreement"), which specifically

10  prohibited Cheung from disclosing AMEC's Confidential Information (as defined in the

11  Confidentiality Agreement) to third parties.  Cheung's Confidentiality Agreement provides, in

12  pertinent part, that Cheung agreed to "hold the Confidential Information in trust and confidence,

13  and not to use, copy, disclose, transmit, reproduce, quote or summarize the Confidential

14  Information for any reason except for the purpose of performing your employment duties for

15  AMEC.  This agreement extends indefinitely beyond the termination of your employment with

16  AMEC."

17      As a term of his employment with AMEC, Brian McNamara acknowledged that he was

18  bound by a duty of confidentiality and McNamara expressly agreed that he "[would] not make

19  any unauthorized copies of any of AMEC's secrets or information without the consent of AMEC,

20  nor remove any business secrets or information from an AMEC facility."  McNamara also signed

21  a Computer, E-mail and Voice Mail Usage Policy stating that AMEC's computer and e-mail

22  systems were for business use only and should not be used for any other purposes.  Additionally,

23  McNamara signed an acknowledgement confirming that he agreed to be bound by AMEC's Code

24  of Business Conduct.

25      In connection with Joseph Niland's employment with AMEC, on or about May 12, 2008,

26  Niland executed an Agreement to Protect Confidential Information, Assign Inventions, and

27  Prevent Unfair Competition and Solicitation (Niland's "Confidentiality Agreement").  Niland's

28  Confidentiality Agreement defines "Confidential Information" as "all nonpublic information

1   (whether in paper or electronic form, or contained in the Employee's memory, or otherwise stored

2   or recorded) relating to or arising from AMEC's business, including, without limitation, trade

3   secrets used, develop[ed or acquired by AMEC (including in connection with the Merger) in

4   connection with its business." "Confidential Information" specifically includes "all information

5   concerning the manner and details of AMEC's operation, organization and management; financial

6   information and/or documents and policies, procedures and other printed, written or electronic

7   material generated or used in connection with AMEC's business; AMEC's business plans and

8   strategies; the identities of AMEC's customers and the specific customer representatives with

9   whom AMEC works; the details of AMEC's relationship with such customers and customer

10   representatives, the identities of distributors, contractors and vendors utilized in AMEC's

11   business, the details of AMEC's relationships with such distributors, contractors and vendors; the

12   nature of fees and charges made to AMEC's customers, forms, contracts and other documents

13   used in AMEC's business; all information concerning AMEC's employees, agents and

14   contractors, including without limitation such person's compensation, benefits, skills, abilities,

15   experience, knowledge and shortcomings, if any; the nature and content of computer software

16   used in AMEC's business, whether proprietary to AMEC or used by AMEC under license from a

17   third party; and all other information concerning AMEC's concepts, prospects, customers,

18   employees, agents, contractors, earnings, products, services, equipment, systems, and/or

19   prospective and executed contracts and other business arrangements."

20          Niland's Confidentiality Agreement provides, in pertinent part, that "[e]xcept in

21   connection with and in furtherance of [Niland's] work on AMEC's behalf, [Niland] shall not,

22   without AMEC's prior written consent, at any time, directly or indirectly: (i) use any Confidential

23   Information for any purpose or (ii) disclose or otherwise communicate any Confidential

24   Information to any person or entity."

25          Niland's Confidentiality Agreement further provides that "unauthorized disclosure of

26   Confidential Information will damage AMEC's business; that Confidential Information would be

27   susceptible to immediate competitive application by a competitor of AMEC's; that AMEC's

28   business is substantially dependent on access to and the continuing secrecy of Confidential

1   Information; that Confidential Information is novel, unique to AMEC and known only to

2   [Niland], AMEC and certain key employees and contractors of AMEC; that AMEC shall at all

3   times retain ownership and control of all Confidential Information; and that the restrictions

4   contained in the Agreement are reasonable and necessary for the protection of AMEC's legitimate

5   business interests."

6          Niland's Confidentiality Agreement also provides that "[u]pon termination of [Niland's]

7   employment with AMEC, or upon AMEC's request, Employee shall immediately deliver to

8   AMEC or its designee (and shall not keep in [Niland's] possession or deliver to any other person

9   or entity) all Confidential Records and all other AMEC property in [Niland's] possession or

10  control."

11         As a term of his employment with AMEC, Syed Rehan acknowledged that he was bound

12  by a duty of confidentiality.  In particular, Rehan acknowledged as part of his terms and

13  conditions of employment that "[AMEC] maintains a policy of confidentiality and non-

14  disclosure.   Confidential information concerning [AMEC's] business or clients may not be

15  disclosed to third parties."  Additionally, Rehan signed a Computer, E-mail and Voice Mail

16  Usage Policy stating that AMEC's computer and e-mail systems were for business use only and

17  should not be used for any other purposes.  In addition, Rehan was bound by AMEC's Code of

18  Business Conduct as a condition of his employment.

19         In connection with Bruce Travers' employment with AMEC, on or about May 13, 2008,

20  Travers signed an Agreement to Protect Confidential Information, Assign Inventions, and Prevent

21  Unfair Competition and Solicitation (Travers' "Confidentiality Agreement").  Travers'

22  Confidentiality Agreement defines "Confidential Information" as "all nonpublic information

23  (whether in paper or electronic form, or contained in the Employee's memory, or otherwise stored

24  or recorded) relating to or arising from AMEC's business, including, without limitation, trade

25  secrets used, develop[ed or acquired by AMEC (including in connection with the Merger) in

26  connection with its business." "Confidential Information" specifically includes "all information

27  concerning the manner and details of AMEC's operation, organization and management; financial

28  information and/or documents and policies, procedures and other printed, written or electronic

1   material generated or used in connection with AMEC's business; AMEC's business plans and

2   strategies; the identities of AMEC's customers and the specific customer representatives with

3   whom AMEC works; the details of AMEC's relationship with such customers and customer

4   representatives, the identities of distributors, contractors and vendors utilized in AMEC's

5   business, the details of AMEC's relationships with such distributors, contractors and vendors; the

6   nature of fees and charges made to AMEC's customers, forms, contracts and other documents

7   used in AMEC's business; all information concerning AMEC's employees, agents and

8   contractors, including without limitation such person's compensation, benefits, skills, abilities,

9   experience, knowledge and shortcomings, if any; the nature and content of computer software

10  used in AMEC's business, whether proprietary to AMEC or used by AMEC under license from a

11  third party; and all other information concerning AMEC's concepts, prospects, customers,

12  employees, agents, contractors, earnings, products, services, equipment, systems, and/or

13  prospective and executed contracts and other business arrangements."

14        Travers' Confidentiality Agreement provides, in pertinent part, that "[e]xcept in

15  connection with and in furtherance of [Travers'] work on AMEC's behalf, [Travers] shall not,

16  without AMEC's prior written consent, at any time, directly or indirectly: (i) use any Confidential

17  Information for any purpose or (ii) disclose or otherwise communicate any Confidential

18  Information to any person or entity."

19        Travers' Confidentiality Agreement further provides that "unauthorized disclosure of

20  Confidential Information will damage AMEC's business; that Confidential Information would be

21  susceptible to immediate competitive application by a competitor of AMEC's; that AMEC's

22  business is substantially dependent on access to and the continuing secrecy of Confidential

23  Information; that Confidential Information is novel, unique to AMEC and known only to

24  [Travers], AMEC and certain key employees and contractors of AMEC; that AMEC shall at all

25  times retain ownership and control of all Confidential Information; and that the restrictions

26  contained in this Agreement are reasonable and necessary for the protection of AMEC's

27  legitimate business interests."

28

1    Travers' Confidentiality Agreement also provides that "[u]pon termination of [Travers']

2    employment with AMEC, or upon AMEC's request, Employee shall immediately deliver to

3    AMEC or its designee (and shall not keep in [Travers'] possession or deliver to any other person

4    or entity) all Confidential Records and all other AMEC property in [Travers'] possession or

5    control."

6            Each of the Raided Employees owed a duty of confidentiality to AMEC under AMEC's

7    Code of Business Conduct. AMEC's Code of Business Conduct provides, in relevant part, that

8    employees "must safeguard company assets [and] deal appropriately with trade secrets and

9    confidential information." AMEC's Code of Business Conduct further provides that

10   "[i]nformation is a critical asset [to AMEC] and includes trade secrets, business processes,

11   strategic development plans, marketing plans, personnel details, advertising and many other plans

12   and studies," and that "[t]rade secrets represent a substantial investment of resources and [AMEC

13   employees] must take care that [they] do not disclose any intellectual property to unauthorized

14   persons."

15           Each of the Raided Employees agreed to abide by AMEC's Code of Business Conduct,

16   which provides that "[c]ommunications, data and all other information generated by or stored on

17   AMEC's information systems are AMEC's property," and that "[d]isclosure of trade secrets and

18   confidential information to unauthorized persons is prohibited." Adherence to AMEC's Code of

19   Conduct, including successful completion of initial and periodic training regarding the Code of

20   Conduct, and annual acknowledgment of and compliance with the Code of Conduct, is a

21   condition of employment by AMEC. Employees sign acknowledgements pursuant to which they

22   agree to abide by the Code of Business Conduct.

23           AMEC maintains an Internet and E-mail Policy that governs each of the Raided

24   Employees' internet and e-mail use while utilizing AMEC e-mail accounts and information

25   technology systems. AMEC's Internet and E-mail Policy requires that "[i]nternet access and e-

26   mail are provided for business purposes," and that the Raided Employees "must not use the

27   [AMEC's] internet access and email facilities . . . to engage in activities that may harm [AMEC's]

28   reputation or the reputation of its clients or suppliers." AMEC's Internet and E-mail Policy

1    further prohibits employees from "[d]ivulging confidential information . . . without appropriate

2    authorization" and prohibits employees from "[s]oliciting for personal gain or profit." AMEC's

3    Internet and E-mail Policy also expressly warns employees that violations of the policy "may

4    result in civil liability or criminal prosecution." Employees sign acknowledgements pursuant to

5    which they agree to abide by the Internet and E-Mail Policy.

6            In addition to the above protections, numerous additional protections are in place to

7    ensure the confidentiality of AMEC documents. Prior to their departure, employees participate in

8    exit interviews and exit as well as termination checklists are prepared stating that AMEC items

9    have been returned to AMEC. Additionally, upon departure, access to AMEC computer systems

10   is terminated for departing employees. Project files for particular projects are subject to restricted

11   access, such that they are only accessible by certain AMEC employees, and certain files are

12   password protected. Certain documents, including project set-up documents and budgeting

13   materials, are specifically identified as for "internal use only," as specified in the Amended

14   Designation. Numerous clients have contractual non-disclosure agreements that limit the

15   disclosure of project files. When requested by the client, AMEC also undertook efforts to

16   maintain confidentiality of the client name in proposals, resumes, and certain other project

17   materials by specifying that it was for a "confidential client." AMEC's clients also have

18   contractual obligations not to disclose or share files with competitors of AMEC for the purpose of

19   completing the subject projects. In addition, certain of the individual defendants acknowledged

20   that project files setting forth the scope of the projects would not be files that would be disclosed

21   to parties other than the client. Moreover, the signature line in employee emails specifies as

22   follows: "The information contained in this e-mail is intended only for the individual or entity to

23   whom it is addressed. Its contents (including any attachments) may contain confidential and/or

24   privileged information. If you are not an intended recipient you must not use, disclose,

25   disseminate, copy or print its contents. If you receive this e-mail in error, please notify the sender

26   by reply e-mail and delete and destroy the message."

27

28

1     Accordingly, the Raided Employees had a duty to refrain from misappropriating the files

2 identified in the designation and to refrain from sharing those documents, or the information

3 contained therein, with any competitor of AMEC.

4 **INTERROGATORY NO. 4:**

5     For each trade secret identified in the DESIGNATION, identify every person at AMEC

6 who was aware of its existence prior to the date YOU contend it was misappropriated by one or

7 more of the DEFENDANTS.

8 **RESPONSE TO INTERROGATORY NO. 4:**

9     In addition to its General Objections, which are incorporated by reference, AMEC objects

10 to this interrogatory to the extent that such information is known or otherwise readily available to

11 Defendants and on the ground that it is overbroad and unduly burdensome and not reasonably

12 calculated to lead to the discovery of admissible evidence. Subject to and without waiving these

13 objections, AMEC responds as follows:

14     Each of the thousands of documents comprising AMEC's trade secrets in the Amended

15 Designation specifies the project to which those files were related, and is specifically

16 incorporated herein by reference. The individuals who were part of the project teams for the

17 subject projects would have been aware of the project files for that project and such information

18 is equally if not more readily available to Defendants who misappropriated such documents and

19 information. Preparation of a document-by-document response detailing of all persons with

20 knowledge of each document's existence would be unduly burdensome to AMEC and AMEC

21 objects to this interrogatory on the basis of such burden and expense particularly considering the

22 misappropriating Defendants' equal if not superior knowledge on the subject. In addition, certain

23 individuals who were responsible for managing the applicable offices and/or units working the

24 subject projects, as well as individuals in the applicable offices who were responsible for filing or

25 maintaining the files for the subject projects, such as the project assistants on the projects and

26 records managers for the offices, would have been aware of the existence of the project files for

27 the subject projects. The specific employees who would have been aware of the project files for

28 each of the subject projects are identified more particularly below.

1      The Amended Designation includes thousands of project files for three key Arizona

2 projects—Plymouth Tube, Prudential Overall Supply and Wilbur-Ellis. Certain Arizona

3 employees in the Scottsdale office were aware of the existence of the project files identified in the

4 Amended Designation for Plymouth Tube, Prudential Overall Supply and Wilbur-Ellis. Those

5 employees included Chris Courtney, Stephanie Koehne, Nimisha Patel, Gwen Minnier, Stacy

6 Lovett, as well as certain other former employees of AMEC, including Bruce Travers, Brian

7 McNamara, Kirk Craig, Robert Fifield, Ed Nemecek, Laurie LaPat and Tiffany Arthur. In

8 addition, certain employees and former employees of AMEC's other Arizona offices were also

9 aware of the existence of such project files, including Dave Peterson, Julie Hamilton, Misael

10 Cabrera and Joe Pisano.

11      Certain employees in the AMEC Oakland office were aware of the existence of the project

12 files related to the Columbia College Hollywood project, including, more particularly those

13 employees who were part of the project team for the Columbia College Hollywood project.

14 Those employees and former employees of AMEC included Ravi Arulanantham, Robert Cheung,

15 Susan Gallardo, Jessie Hurd, Syed Rehan and Scott Warner. In addition, certain other individuals

16 in the Oakland office who were not on the project team, but were responsible for filing or

17 maintaining files for the project, such as the records manager, Ginger Brinlee, were also aware of

18 the existence of such files.

19      Certain employees in the AMEC Oakland office were aware of the existence of the project

20 files related to the Kaiser Merced project, including, more particularly those employees who were

21 part of the project team for the Kaiser Merced project. Those employees and former employees

22 of AMEC included Ravi Arulanantham, Robert Cheung, Susan Gallardo, Syed Rehan, Jim

23 Honniball, and Scott Warner. In addition, certain other individuals in the Oakland office who

24 were not on the project team, but were responsible for filing or maintaining files for the project,

25 such as the records manager, Ginger Brinlee, were also aware of the existence of such files.

26      Certain employees in the AMEC Oakland office were aware of the existence of the project

27 files related to the Chevron UST Closure project, including, more particularly those employees

28 who were part of the project team for the Chevron UST Closure project. Those employees and

1  former employees of AMEC included Ravi Arulanantham, Robert Cheung, Susan Gallardo, and

2  Syed Rehan.  In addition, certain other individuals in the Oakland office who were not on the

3  project team, but were responsible for filing or maintaining files for the project, such as the

4  records manager, Ginger Brinlee, were also aware of the existence of such files.

5       Certain employees in the AMEC Oakland office were aware of the existence of the project

6  files related to the Soco West project, including, more particularly those employees who were

7  part of the project team for the Soco West project.  Those employees and former employees of

8  AMEC included Ravi Arulanantham, Susan Gallardo, Mark Lombardi and Syed Rehan.  In

9  addition, certain other individuals in the Oakland office who were not on the project team, but

10 were responsible for filing or maintaining files for the project, such as the records manager,

11 Ginger Brinlee, were also aware of the existence of such files.

12      Certain employees in the AMEC Oakland office were aware of the existence of the project

13 files related to the Willows Community School project, including, more particularly those

14 employees who were part of the project team for the Willows Community School project.  Those

15 employees and former employees of AMEC included Ravi Arulanantham, Robert Cheung, Susan

16 Gallardo, Jessie Hurd, Syed Rehan, Frank Szerdy and Scott Warner.  In addition, certain other

17 individuals in the Oakland office who were not on the project team, but were responsible for

18 filing or maintaining files for the project, such as the records manager, Ginger Brinlee, were also

19 aware of the existence of such files.

20      Ravi Arulanantham, Jake Torrens, Craig Stewart and possibly others in the Oakland office

21 were aware of the existence of the project files for Lorentz Barrel & Drum project.  Robert

22 Cheung and possibly others in the Oakland office were aware of the existence of the project files

23 for the Lerer Brothers Transmission project.

24 **INTERROGATORY NO. 5:**

25      For each trade secret identified in the DESIGNATION, identify every PERSON or

26 government entity, other than YOU, to whom it was disclosed prior to the date YOU contend it

27 was misappropriated by one or more of the DEFENDANTS.

28

1   RESPONSE TO INTERROGATORY NO. 5:

2          In addition to its General Objections, which are incorporated by reference, AMEC objects

3   to this interrogatory to the extent that such information is equally known or otherwise readily

4   available to Defendants.  AMEC further objects to this interrogatory to the extent that it is

5   overbroad and unduly burdensome.  Subject to and without waiving these objections, AMEC

6   responds as follows:  As discussed during our meet and confer on April 18, 2013, AMEC has

7   agreed to provide a chart that sets forth those documents identified from the trade secret

8   designation that were, based on a review of the documents, disclosed to the client, and/or to any

9   government entity, subcontractor, consultant and/or vendor a copy of which is attached as

10  Exhibit A to AMEC's Responses to Geosyntec's First Set of Requests for Production.

11  INTERROGATORY NO. 6:

12         For each trade secret identified in the DESIGNATION, state all facts supporting YOUR

13  contention that its misappropriation has caused YOU harm.

14  RESPONSE TO INTERROGATORY NO. 6:

15         In addition to its General Objections, which are incorporated by reference, AMEC objects

16  to this interrogatory on the grounds that discovery is not complete, such information is in the

17  hands of Defendants, who took the documents and used them to interfere with AMEC's contracts

18  with its clients.  AMEC therefore specifically reserves the right to supplement this interrogatory

19  based on additional investigation and discovery.  AMEC further objects to this interrogatory as

20  overbroad and unduly burdensome.  Preparation of a document-by-document response detailing

21  all facts concerning each individual document in the Amended Designation would be unduly

22  burdensome to AMEC and AMEC objects to this interrogatory on the basis of such burden and

23  expense.  Moreover, AMEC objects to this interrogatory as premature to the extent that it seeks

24  information that will be the subject of expert testimony.  Subject to and without waiving these

25  objections, AMEC responds as follows:

26         AMEC is informed and believes that Geosyntec took some or all work for certain of the

27  projects identified in the Amended Designation, including, but not limited to, Plymouth Tube,

28  Prudential Overall Supply, Wilbur-Ellis, Columbia College Hollywood, Willows Community

1    School, Soco West and certain Chevron portfolio underground storage tank work.  AMEC is

2    informed and believes that possession and use of such materials facilitated the securing of such

3    projects and clients by Geosyntec.  AMEC has suffered direct harm in the form of lost revenue on

4    those projects, as well as future work with those clients.  Further AMEC suffered direct harm

5    through the manpower expended, lost hours and opportunity costs incurred through the efforts to

6    retain the above projects.  The actual calculation of all such damages and the harm suffered to

7    AMEC will be the subject of further discovery, which has already been propounded by AMEC,

8    but for which AMEC has not yet received responses.  Defendants' use of such materials and

9    information is the subject of pending discovery and will be the subject of forensic investigation.

10    Such damages and harm will also be the subject of expert testimony.

11    **INTERROGATORY NO. 7:**

12       Identify every former employee of Geomatrix Consultants, Inc. who has resigned from

13    YOU since January 1, 2012, the dates of their resignations, and their new employer (if known).

14    **RESPONSE TO INTERROGATORY NO. 7:**

15       In addition to its General Objections, which are incorporated by reference, AMEC objects

16    to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the

17    discovery of admissible evidence.  Subject to these objections, AMEC responds as follows:

18

19

| Name | Last Day with AMEC | Current Employer (if known) |
|---|---|---|
| Cruikshank, Alyssa K. | 04/08/2013 | |
| Neal, Nicole R. | 04/05/2013 | |
| Weaver, Jeffrey D. | 04/03/2013 | |
| Storb, Meryl B. | 03/29/2013 | |
| Hazen, David | 03/27/2013 | |
| Denton, Joe A. | 03/25/2013 | |
| Valavanis, Dena D. | 03/22/2013 | Brown and Caldwell |
| Baldwin, Allie | 03/15/2013 | T.E.S.A./BEST Consulting, Inc. |
| Andrews, Erin E. | 03/08/2013 | Telefunken Semiconductors |
| Verwiel, Ann H. | 03/01/2013 | ToxStrategies, Inc. |
| Grotbo, Heather C. | 02/25/2013 | |
| Warner, Scott D. | 02/15/2013 | Environ |
| Coppersmith, Ryan | 01/31/2013 | Coppersmith Consulting, Inc. |
| Bernhardt, Todd C. | 01/18/2013 | Iris Environmental |
| Delong, Paula | 01/18/2013 | |

| | | |
|---|---|---|
| Fox, Shane A. | 01/18/2013 | Newfields |
| McKay, Levi K. | 01/18/2013 | |
| Sanchez De Lozada, Claudia | 01/18/2013 | GSI Environmental, Inc. |
| Tangen, Linda L. | 01/11/2013 | |
| Wood, Timothy F. | 01/11/2013 | Albritton Construction |
| Chakrabarti, Bhabesh | 01/04/2013 | Veolia Water |
| Gee, Karen W. | 01/04/2013 | |
| Smith, Stephanie M. | 01/04/2013 | |
| Noble, Sherwood E. | 12/22/2012 | |
| O'Reilly, Devin A. | 12/21/2012 | |
| Malhotra, Rupeet | 11/21/2012 | BKF Engineers |
| Calhoun, Michael J. | 11/09/2012 | Haley & Aldrich |
| Staley, Sally A. | 11/09/2012 | |
| Jacobson, Joel M. | 11/02/2012 | Newfields |
| Tallman Williams, Amelia A. | 11/02/2012 | Newfields |
| Laprarie, Brian A. | 10/26/2012 | |
| McCammon, Donna | 10/25/2012 | |
| Cummings, Michael A. | 10/17/2012 | |
| Pederson, Jonathan I. | 10/05/2012 | Newfields |
| Perine, Adam N. | 10/05/2012 | Newfields |
| Welzenbach, Wilhelm R. | 10/05/2012 | |
| Kawahara, Evan M. | 09/29/2012 | Geosyntec |
| Bloes, Martin B. | 09/28/2012 | Pivox Corporation |
| Pare, Marie-Helene | 09/26/2012 | Newfields |
| Wright, Matthew D. | 09/21/2012 | Newfields |
| Jennings, Kevin N. | 09/14/2012 | |
| Zeiler, Kurt K. | 09/14/2012 | Brown and Caldwell |
| Blodgett, Eric S. | 09/07/2012 | Barr Engineering |
| Clark, Kenneth W. | 09/07/2012 | Newfields |
| Hoese, Brian J. | 09/07/2012 | Barr Engineering |
| Stringer, Arthur C. | 09/07/2012 | Newfields |
| Nielson-Cerquone, Christopher | 09/06/2012 | Newfields |
| Rogness, Douglas | 09/05/2012 | |
| Valdez, Gloria C. | 09/01/2012 | |
| Bair, Jason | 08/31/2012 | |
| Lachell, Wai Chin | 08/31/2012 | |
| Green, Lynne N. | 08/22/2012 | Newfields |
| Frappa, Richard H. | 08/16/2012 | |
| Bacher, Niklas | 08/10/2012 | Anchor QEA |
| Klitzke, Tiffany R. | 08/03/2012 | |
| McIntosh, Kelly R. | 08/03/2012 | |
| Blackshear, Dylan T. | 08/01/2012 | |
| Bolanos, Maria | 07/27/2012 | |

| | | |
|---|---|---|
| Delfino, Thomas A. | 07/23/2012 | |
| Leonard, Diana M. | 07/10/2012 | Brown and Caldwell |
| Payne, Charles W. | 06/29/2012 | |
| Bella, Fernando | 06/28/2012 | Service West |
| McPherson, Katherine A. | 06/08/2012 | |
| Veis, Christopher A. | 06/07/2012 | Engineering West |
| Johnson, Frederick Wayne | 06/04/2012 | Fluor |
| Guiltinan, Eric J. | 05/25/2012 | |
| Hatch, Carrie M. | 05/25/2012 | |
| Keefer, Mark D. | 05/25/2012 | Braun Intertec Corp. |
| Grotbo, Myles F. | 05/18/2012 | Newfields |
| Grotbo, Terry M. | 05/18/2012 | Newfields |
| Price, James C. | 05/18/2012 | Self Employed |
| Snider, Mary | 05/18/2012 | |
| Tangen, Thomas | 05/18/2012 | |
| Croteau, Darren R. | 05/17/2012 | Iris Environmental |
| Chu, Min-Ying | 05/07/2012 | Haley & Aldrich |
| Bennett, Peter J. | 05/04/2012 | Haley & Aldrich |
| Fure, Adrian | 05/04/2012 | Haley & Aldrich |
| Wyckoff, Robert L. | 05/01/2012 | Brown and Caldwell |
| Einarson, Murray D. | 04/30/2012 | Haley & Aldrich |
| Dockery, Martin | 04/20/2012 | |
| Foote, Gary R. | 04/20/2012 | Terra Pacific Group |
| Villagomez-Roe, April M. | 04/18/2012 | Environmental Resources Management |
| Schmitt, Kelly J. | 04/13/2012 | |
| Morita, Eric | 04/04/2012 | |
| McCartney, Marjory M. | 04/02/2012 | |
| Levy, David B. | 03/27/2012 | |
| Gillion, Kathleen R. | 03/04/2012 | Moffatt & Nichol |
| Garcia, Mary A. | 03/03/2012 | Health Fair Coordinator |
| Jazdzewski, Jeremiah | 03/02/2012 | Houston Engineering, Inc. |
| Schofield, Michael L. | 02/29/2012 | GSI Environmental, Inc. |
| Beck, Michael T. | 02/24/2012 | Braun Intertec Corp. |
| Lojo, Andrew M. | 02/24/2012 | Antea Group |
| Robinson, Jack C. | 02/17/2012 | Crusoe Construction LLC |
| Huffine, Michael S. | 02/04/2012 | |
| Erickson, Gwendolyn J. | 02/03/2012 | |
| Ohland, Grant L. | 01/23/2012 | Newfields |
| Glaser, Laura L. | 01/20/2012 | |
| Pineda, Kristen S. | 01/18/2012 | |
| Taylor, Adam E. | 01/13/2012 | |
| Thompson, Christopher F. | 01/13/2012 | Braun Intertec Corp. |
| Hatton, Scott J. | 01/11/2012 | Access Midstream Partners LLC |

CBM-SF\SF583807

PLAINTIFF AMEC'S OBJECTIONS AND RESPONSES TO INTERROGATORIES, SET ONE    (CASE NO. C 12-CV-2973-TEH)

1    Dated:  May 15, 2013

2                                    CARROLL, BURDICK & McDONOUGH LLP

3

4                                    By
                                          Robert J. Nolan
5                                    Attorneys for Plaintiff AMEC Environmental &
                                     Infrastructure, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF AMEC'S OBJECTIONS AND RESPONSES TO INTERROGATORIES, SET ONE        (CASE NO. C 12-CV-2973-TEH)

**VERIFICATION**

I, David Peterson, declare:

I am an employee of the Plaintiff in the above-entitled action. I am a Senior Vice President and Principal Geologist and through most of 2012, I was the Arizona Operations Manager for AMEC Environment & Infrastructure, Inc. ("AMEC"). I have read the foregoing Plaintiff AMEC Environment & Infrastructure, Inc.'s Objections and Responses to Defendant Geosyntec's First Set of Interrogatories ("Responses"), and know the contents thereof. As the Arizona Operations Manager through the period of interest, I am familiar with the Arizona projects (Plymouth Tube, Prudential Overall Supply and Wilbur-Ellis) referred to in the Responses to Interrogatories 1 through 6, and verify the same to be true of my own knowledge, except as to matters therein stated on information and belief and as to those matters I believe them to be true. I am informed and believe that the Response to Interrogatory 7 is true based on information obtained through AMEC's systems.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Phoenix, Arizona on this 17 day of May, 2013.

David Peterson

-1-

**VERIFICATION**

I, Susan Gallardo, declare:

I am an employee of the Plaintiff in the above-entitled action. I am Principal Engineer and the former Business Unit Manager for the Oakland office of AMEC Environment & Infrastructure, Inc. ("AMEC"). I have read the foregoing Plaintiff AMEC Environment & Infrastructure, Inc.'s Objections and Responses to Defendant Geosyntec's First Set of Interrogatories ("Responses"), and know the contents thereof. As Business Unit Manager for the Oakland office during the relevant time frame, I am familiar with the Oakland projects (Chevron UST Closures, Willows Community School, Columbia College Hollywood, Kaiser Merced, Soco West, and Lorentz Barrel & Drum) referred to in the Responses to Interrogatory Nos. 1 through 6, and verify the same to be true of my own knowledge, except as to matters therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Oakland, California on this 15th day of May, 2013.

Susan Gallardo
Susan Gallardo

-1-

*AMEC Environment & Infrastructure, Inc. v. Geosyntec, et al.*
U.S. District Court, Northern District of California, Action No. 12-2973 TEH

### PROOF OF SERVICE BY MAIL

I declare that I am employed in the County of San Francisco, California. I am over the age of eighteen years and not a party to the within cause; my business address is 44 Montgomery Street, Suite 400, San Francisco, CA 94104. On May 15, 2013, I served the enclosed:

**PLAINTIFF AMEC ENVIRONMENT & INFRASTRUCTURE, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT GEOSYNTEC'S FIRST SET OF INTERROGATORIES**

.on the parties in said cause (listed below) by enclosing a true copy thereof in a sealed envelope and, following ordinary business practices, said envelope was placed for mailing and collection (in the offices of Carroll, Burdick & McDonough LLP) in the appropriate place for mail collected for deposit with the United States Postal Service. I am readily familiar with the Firm's practice for collection and processing of correspondence/documents for mailing with the United States Postal Service and that said correspondence/documents are deposited with the United States Postal Service in the ordinary course of business on the same day.

Richard C. Darwin                                  Defendants
Peter H. Bales
BUCHALTER NEMER
55 Second St., Suite 1700
San Francisco, CA 94105-3493
(415) 227-0900
Fax: (415) 227-0770

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on May 15, 2013, at San Francisco, California.

Kelley Blakeman

# EXHIBIT B



**BuchalterNemer**
A Professional Law Corporation

55 SECOND STREET, SUITE 1700, SAN FRANCISCO, CALIFORNIA 94105-3493
TELEPHONE (415) 227-0900 / FAX (415) 227-0770

File Number:G1957-002
Direct Dial Number: (415) 227-3655
Direct Facsimile Number: (415) 904-3121
E-Mail Address: pbales@buchalter.com

May 30, 2013

**VIA U.S. MAIL AND E-MAIL**
*RNOLAN@CBMLAW.COM*
*MMILLER@CBMLAW.COM*

Robert J. Nolan
Matthew F. Miller
Carroll, Burdick & McDonough LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

      Re:    *AMEC v. Geosyntec; et al.*

Dear Counsel:

      We are in receipt of Plaintiff's Responses to Defendants' First Sets of Interrogatories and Requests for Production. The purpose of this letter is to initiate a meet and confer, pursuant to Local Rule 37-1, regarding a number of the responses that are defective and fail to comply with the Requirements of Federal Rules of Civil Procedure 33 and 34. Defendants would like to avoid a motion to compel on these issues and therefore request Plaintiff to serve amended responses. Please let me know when you are available on Monday or Tuesday of next week to arrange a telephone call to meet and confer on these issues and determine whether any can be resolved without a discovery motion.

      <u>**Plaintiff Refuses to Provide Facts To Support Each Purported Trade Secret**</u>

      Plaintiff contends that Geosyntec and its employees misappropriated almost 400 trade secrets. Now that Plaintiff has identified the universe of the purported trade secrets (the "DESIGNATION"), Defendants are entitled to the facts that support those contentions. *See* Fed. R. Civ. Proc. 33(a)(2); *see also FormFactor, Inc. v. Micro–Probe, Inc.*, 2012 WL 2061520, at * 5 (N.D.Cal. June 7, 2012)(PJH); *citing O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1072–75 (N.D.Cal.2005) ("A plaintiff asserting a trade secret misappropriation claim under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ.Code § 3426.1, et seq., bears the burden of proving each element of the claim **as to each claimed trade secret.**")(Emphasis added).[1]  Plaintiff refuses to provide those facts on the grounds that such

---

[1] "To prevail on a misappropriation claim under the CUTSA, the plaintiff must establish that [1] it owns a clearly identified trade secret; [2] that the defendant acquired, disclosed, or used the plaintiff's trade secret through

**BuchalterNemer**

Robert J. Nolan
May 30, 2013
Page 2

responses would be burdensome.

     For example, Interrogatory No. 1 simply asks Plaintiff to identify what types of trade secrets are at issue for "each trade secret identified in the DESIGNATION…"   Rather than provide that information, Plaintiff responds by repeating the allegations in its First Amended Complaint concerning the broad "categories" of documents.[2]  Plaintiff states that "[e]ach trade secret specifically falls into each of the categories," but then also vaguely claims that the trade secrets "fall[] into one or more of the subject categories…"  It is clear that Plaintiff contends that there are a variety of types of trade secrets that were misappropriated.  Defendants are entitled to know for each trade secret whether plaintiff claims it is "a formula, pattern, compilation, program, device, method, technique, process, or some other type of information."  *See* Cal. Civ.Code § 3426.1(d).

     Moreover, it is plaintiff's burden to provide the facts showing what type of trade secrets are at issue.  "A plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'"  *FormFactor, Inc.* * 5; *citing MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir.1993); and *Agency Solutions.Com, LLC v. The TriZetto Group, Inc.*, 819 F.Supp.2d 1001, 1015 (E.D.Cal.2011) ("to identify the trade secret with particularity, the plaintiff must first 'clearly identify what the 'thing' is that is alleged to be a trade secret,' and second, must 'be able to clearly articulate why that 'thing' belongs in the legal category of trade secret'").[3]  This includes, at a minimum, describing which type of protectable information-as defined in Civ.Code § 3426.1(d)-each trade secret is.

     Plaintiff claims that responding to this interrogatory, as well as the others identified in this letter, with the information requested for each trade secret would be too burdensome.  *See* Response to No. 1 ("Preparation of a document-by-document response with respect to each individual document in the Amended Designation would be unduly burdensome to AMEC…")  While it may take some time for Plaintiff and its counsel to respond to these interrogatories, that is certainly no excuse for refusing to respond with the information requested.  This is precisely the information that AMEC will have to present at trial in order to meet its burden of proof, and there is no valid basis for withholding that information from discovery.  These interrogatories are

---

improper means; and [3] that the misappropriation caused damage to the plaintiff." *FormFactor, Inc.* at *5 citing *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal.App.4th 1658, 1665, 3 Cal.Rptr.3d 279 (2003).
[2] *See Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, 2007 WL 2298009, *7 (N.D. Fla. 2007) ("Plaintiff's verbatim copying of paragraphs contained in the complaint is no more effective an answer to [the interrogatory] than [plaintiff's] bare citation to the complaint. [The interrogatory] seeks further information about the facts underlying Plaintiff's allegations, not a second recitation of the complaint.)
[3] "It is axiomatic that a party may not assert a cause of action for misappropriation of trade secrets without identifying for the opposing party the trade secrets at issue." *Knights Armament Co. v. Optical Systems Technology, Inc.* 254 F.R.D. 463, 467 (M.D. Fla. 2008) aff'd, 254 F.R.D. 470 (M.D. Fla. 2008); *citing Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F.Supp.2d 1322, 1324-25 (S.D.Fla. 2001).  "Because [Plaintiffs] chose to bring a claim for misappropriation of trade secrets, [they] must identify the trade secrets [they] contend were wrongfully misappropriated." *Knights Armament Co. v. Optical Systems Technology*, Inc. 254 F.R.D. at 467.  Because "…the possibilities of trade secrets are so vast, [Plaintiffs] must list and reasonably describe the trade secrets [they] wish to protect." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F.Supp.2d at 1326.  Plaintiffs cannot expect Defendants "to embark upon a fishing expedition to ascertain what those secrets are." *Ibid.*

BuchalterNemer

Robert J. Nolan
May 30, 2013
Page 3

authorized and necessitated by the scope of Plaintiff's claims and trade secret designation.

In *North American Lubricants Co. v. Terry* 2011 WL 5828232 (E.D. Nov. 18, 2011) the district court granted defendant's motion to compel where plaintiff refused to provide a response with sufficient detail as to "each trade secret" which was specifically called for by the interrogatory. The Court explained that:

> [Plaintiff's claimed trade secrets for] "business model," "business plan," and "marketing materials," as well as any of the other "boilerplate" items must be described with particularity (e.g. by author(s), date of creation, subject matter, basis for trade secret claim, etc.) or be removed from the response to this interrogatory. Voluminous files or items may be reasonably categorized, but the descriptions must be sufficiently specific to notify defendants of the subject matter and basis of the trade secret claims.[4]

A court will only limit the scope of relevant discovery "if the burden of the proposed discovery outweighs its likely benefit." Fed. R. Civ.P. 26(b)(2)(C)(iii). Here, the benefit and relevance are clear as this is a trade secret case where Plaintiff must establish the elements of such a claim. Plaintiff provides no explanation or basis for why it would be unduly burdensome or costly to respond to these proper contention interrogatories. Fed. R. Civ.P. 33(a)(2). The requirements for a party objecting on grounds of burden were recently summarized by the Eastern District in *Anderson v. Hansen* 2013 WL 428737, *2-3 (E.D. Cal., Feb. 1, 2013):

> The responding party is obligated to respond to the interrogatories to the fullest extent possible. *See* Fed.R.Civ.P. 33(b)(3). Any objections must be stated with specificity. Fed.R.Civ.P. 33(b)(4). The responding party shall use common sense and reason in its responses; hyper-technical, quibbling, or evasive objections will not be viewed favorably by the court. *Haney v. Saldana*, 2010 WL 3341939 at *3 (E.D.Cal. Aug.24, 2010). Further, the responding party has a duty to supplement any responses if the information sought is later obtained or the response provided needs correction. Fed.R.Civ.P. 26(e)(1)(A).

> All grounds for objection to an interrogatory must be stated "with specificity." Fed.R.Civ.P. 33(b)(4); *see Nagele v. Electronic Data Systems Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y.2000) (objection that interrogatories were "burdensome" overruled because objecting party failed to "particularize" the basis for objection); [...] *Mitchell*

---

[4] While Plaintiff's DESIGNATION does have a "description" column, that description does not provide the information sought in these interrogatories. For example, Plaintiff does not describe for each trade secret whether it is "a formula, pattern, compilation, program, device, method, technique, process, or some other type of information." *See* Cal. Civ.Code § 3426.1(d).

BuchalterNemer

Robert J. Nolan
May 30, 2013
Page 4

> *v. National R.R. Passenger Corp.*, 208 F.R.D. 455, 458 at n. 4
> (D.D.C.2002) (objections must explain how request or
> interrogatory is overbroad or unduly burdensome)

Plaintiff cannot with one hand claim that Defendants misappropriated almost 400 individual trade secrets, and then with the other hand refuse to provide Defendants with the facts showing why plaintiff contends each document is a trade secret or why it caused plaintiff damages: these are facts AMEC will necessarily have to present at trial or to overcome a motion for summary judgment. Similar to Interrogatory No. 1, Plaintiff refuses to provide the information requested for "each trade secret" in response to Interrogatories Nos. 2, 3, 5, and 6 relying on the same inappropriate burden objections.

Interrogatory No. 2 asks Plaintiff to describe the economic value for each trade secret in the DESIGNATION. "To establish independent value, a plaintiff must show that the trade secret is 'sufficiently valuable and secret to afford an actual or potential economic advantage over others' who do not possess the information." *FormFactor, Inc.* * 7; *citing Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal.App.4th 547, 564 (2007); and *Religious Tech. Center v. Netcom On-Line Commc'n Servs., Inc.*, 923 F.Supp. 1231, 1252–53 (N.D.Cal.1995). Plaintiff again refuses to answer the interrogatory, except only in the broadest terms without any facts showing the purported independent economic value of each trade secret.

Interrogatories Nos. 3, 4, and 5 all seek facts related to whether or not the documents that Plaintiff claims are trade secrets were disclosed or public knowledge. "Information is protectable as a trade secret where the owner has made 'reasonable efforts under the circumstances to maintain its secrecy.'" *FormFactor, Inc.* * 7; *citing* Cal. Civ.Code § 3426.1(d)(2). "Public disclosure is 'fatal to the existence of a trade secret.'" *Ibid.; citing Apple, Inc. v. Psystar Corp.*, 2012 WL 10852 at *1 (N.D.Cal. Jan. 3, 2012). Interrogatory No. 3 asks Plaintiff to describe the efforts Plaintiff took to keep each document in the DESIGNATION secret. No. 4 asks Plaintiff to identify who was aware of each trade secret and No. 5 asks Plaintiff to identify every person to whom each trade secret was disclosed. Plaintiff again refuses to provide the information requested for each trade secret.

The only minor exception is in response to Interrogatory No. 5 where Plaintiff references a chart (attached as Exhibit A to Plaintiff's Responses to First Set of Requests for Production), which Plaintiff claims contains information identifying whether *some of the* documents were disclosed. However, that chart is incomplete and deficient.

First, Plaintiff appears to unilaterally limit the list of "PERSONS" to "the client, and/or to any government entity, subcontractor, consultant, and/or vendor." Is Plaintiff excluding any other persons that the documents were disclosed to? Second, the "Disclosure" column is blank for over half of the trade secrets. Does that mean that Plaintiff is confirming that it was not disclosed or simply that it has not made that determination one way or another? Third, Plaintiff fails to identify the specific persons that the documents were disclosed to. Rather, Plaintiff states "client" or a name of an entity without providing the name of the person at that client or third

BuchalterNemer

Robert J. Nolan
May 30, 2013
Page 5

party entity.  Fourth, on pages 66 onward of the chart Plaintiff references "multiple" under the
project heading (without any reference to any particular document), then also (if not blank)
Plaintiff directs Defendants to "see specific [unidentified] entries pertaining to these
[unidentified] documents."  Such a response provides no direction to Defendants on how to
possibly ascertain the answer to Interrogatory No. 5.

      "The final requirement to establish misappropriation of trade secrets is to show that the
alleged misappropriation caused damage to the plaintiff."  *FormFactor, Inc.* * 13 (citations
omitted).  Interrogatory No. 6 asks Plaintiff to state all facts showing how it was harmed by the
alleged misappropriation of each trade secret.  Plaintiff claims that "the actual calculation of all
such damages and the harm suffered to AMEC will be the subject of further discovery."
Regardless of what further discovery occurs, Defendants are entitled to a verified discovery
response identifying Plaintiff's current damage claims and what facts Plaintiff currently has to
support those damages <u>for each trade secret at issue</u>.  Months ago Plaintiff provided unverified
initial disclosures that identify damages, including a damage calculation.  Defendants are entitled
to verified discovery responses setting forth those damages as to each trade secret.

### Plaintiff Refuses to Provide the Documents To Show Who The Trade Secrets Were Disclosed To

      Defendants requested that Plaintiff produce all documents which relate to the disclosure
of each trade secret identified in the DESIGNATION.  *See* Document Requests Nos. 34 and 35.
Rather than agree to produce any documents, Plaintiff chose to provide the chart attached as
Exhibit A.  The chart is defective for the same reasons discussed above addressing AMEC's
response to Interrogatory No. 5.

      Moreover, the chart does not comply with Plaintiff's obligation under Rule 34 to produce
the responsive documents that Plaintiff relied upon to create the chart.  Plaintiff admits that the
chart is based upon some "review of [unidentified] documents."  Defendants are entitled to those
documents and Plaintiff asserts no objection that warrants withholding them from production.
Plaintiff's objection that the request seeks documents that are "not reasonably calculated to lead
to the discovery of admissible evidence" is meritless.  The documents are directly relevant to
Plaintiff's claims.  *See FormFactor, Inc.* * 7 ("Public disclosure is 'fatal to the existence of a
trade secret.'") *citing Apple, Inc. v. Psystar Corp.*, 2012 WL 10852 at *1.  The documents that
Plaintiff is refusing to produce will show the information that is clearly missing from the chart
including, but not limited to, (1) when the document was disclosed, (2) in what context it was
disclosed, (3) who disclosed it, (4) the PERSONS it was disclosed to, and (4) how many times it
was disclosed.

      Plaintiff must produce all responsive documents.

### Plaintiff's Claim of Work Product and Refusal to Produce Documents Is Deficient

      Document Requests Nos. 38 through 42 ask for Plaintiff to produce all documents
supporting Plaintiff's contention that the individual defendants "exceeded [their] authorized
access to the computer(s) [they] used at AMEC..."  Rather than agree to produce any documents
or admit that Plaintiff has no documents, Plaintiff claims that any responsive documents are

Buchalter Nemer

Robert J. Nolan
May 30, 2013
Page 6

"privileged and constitutes work product." Plaintiff must provide a privilege log identifying and describe the documents in sufficient detail to enable Defendants "to assess the applicability of the privilege or protection." Fed. R. Civ. P. 26(b)(5).

Similar to its refusal to identify the facts that support Plaintiff's purported trade secrets, Plaintiff cannot refuse to produce documents supporting its claims that the individual defendants violated the Computer Fraud and Abuse Act and Penal Code section 502. If Plaintiff currently has no responsive non-privileged documents to support its contention it must respond as such (as Plaintiff did with other requests).

Plaintiff devotes two causes of action and almost thirty paragraphs of its First Amended Complaint to allege the individual defendants exceeded their authorized access to AMEC's computers. The allegations imply that Plaintiff certainly has *some* documentation (whether electronically stored or not) to support its contentions. If so, Plaintiff must produce it now. If Plaintiff refuses to do so in discovery but then attempts to do so at trial, Defendant will request that the Court preclude Plaintiff from presenting any documents to support its claims.

I look forward to discussing these issues and hopefully resolving them through voluntary amended responses rather than a motion to the Court. Please let me know when you are available on Monday, June 3 or Tuesday, June 4 for a telephone call to meet and confer.

Very truly yours,

BUCHALTER NEMER
A Professional Corporation

By

Peter H. Bales

PB:pb

cc: Richard C. Darwin

BN 14083527v1

# EXHIBIT C



CBM **CARROLL, BURDICK**
**& McDONOUGH**

June 10, 2013

Carroll, Burdick & McDonough LLP                                    Robert J. Nolan
44 Montgomery Street                                          Direct Dial: 415.743.2445
Suite 400                                                       rnolan@cbmlaw.com
San Francisco, CA
94104-4606
                          <u>Via Email and U.S. Mail</u>
415.989.5900
415.989.0932 Fax
www.cbmlaw.com            Peter H. Bales, Esq.
Los Angeles               Buchalter Nemer
Sacramento                55 Second Street, Suite 1700
                          San Francisco, CA  94105-3493

                 **Re:**   *AMEC v. Geosyntec et al.,* Case No. CV-12-2973 THE

          Dear Peter:

                 This responds to your letter of May 30.  We disagree with the
          contentions in your letter, but in the spirit of cooperation hope that we can
          resolve some of the issues that you raise.

                 Preliminarily, you dedicate a significant amount of your letter to
          contending that AMEC has not sufficiently identified its trade secrets.  AMEC
          served a trade secret designation in March.  The purpose of the designation
          was to identify AMEC's trade secrets pursuant to Code of Civil Procedure
          section 2019.210, which requires a party "to identify the trade secret with
          reasonable particularity."  Upon receiving the designation, Mr. Darwin
          requested that we revise it to make certain specifications to it to further narrow
          the scope of the designation.  We revised it accordingly, and served and
          Amended Designation.  As to the Amended Designation, Mr. Darwin agreed
          that AMEC had sufficiently identified its trade secrets, noting, in particular, in a
          March 22 email, "Matt and Rob, based on the revised version you sent at
          around 6:00 p.m. last night, we will not be filing a motion regarding the
          adequacy of the trade secret designation (assuming the final service version is
          the same)."  Indeed, AMEC spent a very significant amount of time and
          resources identifying AMEC's trade secrets amongst the many thousands of
          documents taken by your clients, only to later receive an additional production
          containing hundreds more documents taken by your clients from AMEC.
          While, as we have indicated, AMEC intends to amend its designation, any
          current contention that AMEC has somehow not sufficiently identified its trade
          secrets rings hollow.

                 Your attempt to argue in footnote 2 of your letter that AMEC cannot
          refer to or quote from the First Amended Complaint ("FAC") in responding to

Peter H. Bales, Esq.
Re:  *AMEC v. Geosyntec et al.*
June 10, 2013
Page 2

interrogatories is similarly without merit.  The FAC is extremely detailed,
comprising more than 70 pages containing more than 350 paragraphs.  This is
not the typical case nor the typical complaint.  AMEC set forth its allegations in
significant detail after a careful investigation and is allowed to rely on it in part
in responding to discovery.

    With respect to Interrogatory No. 1, there is simply no requirement that,
and you cite no cases in which, a party was required to state whether its trade
secret is a formula, pattern, compilation, program, device, method, technique,
process, or some other type of document.  This language is taken directly out
of the statute, and, on its face, calls for a legal conclusion.  Interrogatory No. 1,
along with all the other interrogatories you have issued, also violates Rule 33,
which only permits a party to serve 25 interrogatories, because they seek
information about hundreds of documents and therefore contain hundreds of
subparts.  *See Dura Global, Technologies, Inc. v. Magna Donnelly Corp.*, CIV
A 07-CV-10945-DT, 2008 WL 3889735, at *2 (E.D. Mich. Aug. 18, 2008)
(noting in a patent infringement and trade secret misappropriation case that
"[b]ecause of the manner in which Defendant drafted Interrogatory nos. 17 and
18, requesting information regarding each document produced by Plaintiffs,
each interrogatory seeks hundreds if not thousands of discrete pieces of
information.  Therefore, the Court will not compel Plaintiffs to respond with any
more information than they have already provided.").

    Even setting aside these valid objections to your onerous requests, the
cases you cite make clear that the categories copied verbatim by you from the
statute are illustrative rather than restrictive:  "the case authority the court has
reviewed appears to use the statutory categories of things that may constitute
a trade secret—information, including a formula, pattern, compilation, program,
device, method, technique or process—as illustrative rather than restrictive."
*Agency Solutions.com LLC v. Trizette Group, Inc.*, 819 F. Supp. 2d 1001, 1016
(E.D. Cal. 2011).  AMEC has stated—with a great degree of specificity—those
specific documents and items that it contends constitute its trade secrets.  In
*Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443 (2002), the court held that
categories of trade secrets—including, pricing of products, profit margins,
production costs, pricing concessions, volume rebates, trade discounts and
payment terms offered to customers, the company's market research,
advertising strategy plans, rebate incentives, the company's advertising, sales
and promotion budgets, finishing processes for products, composite material
process technologies, and specific strategic plan documents—were all defined
with sufficient particularity.  Similarly, in *San Jose Construction, Inc. v.
S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1538 (2007), the Court held that
plaintiff was entitled to protection over project binders that included information
similar to that over which AMEC contends constitute its trade secrets here.
Indeed, AMEC has expressly identified its project files for specific projects,

Peter H. Bales, Esq.
Re:   *AMEC v. Geosyntec et al.*
June 10, 2013
Page 3

which were taken by certain of the Individual Defendants, as protectable trade secrets, and it has set forth in detail by Bates range, description and project those documents it claims constitute those project files that were misappropriated. It is hard to imagine AMEC being any more clear about what comprises its trade secrets in this case. We are well past the issue of whether AMEC identified its trade secrets with particularity. Nothing more is required.

With respect to Interrogatory No. 2, AMEC's has sufficiently identified the independent economic value of its trade secrets. As the *San Jose Construction* Court made clear, "We can readily infer . . . that the information contained in SJC's project binders, viewed as a whole, derived economic value from being kept a secret from competitors such as South Bay. As SJC describes it, 'only SJC had completed the puzzle for each project, contained in the binders " The same is true here, and AMEC has made this clear in response to Interrogatory No. 2. Nothing more is required. To the extent you intended this interrogatory to seek information about damages (which is not clear from the face of the interrogatory), it is premature as that will be the subject of expert reports and testimony, which are not due for some time. Further, your clients well know that the items taken do not possess readily identifiable "retail" values such that one document costs $5, another $100, etc. The "value" of the documents will be debated by credible experts, not by AMEC current employees who did not create the documents, nor work on the subject products.

Interrogatory Nos. 3-5 are objectionable and overbroad for the same reasons. They violate Rule 33 insofar as they seek information about each document identified in the designation.

With respect to Interrogatory No.3, AMEC's response is plainly sufficient. It spans approximately 8 pages and identifies those efforts undertaken to maintain the secrecy of its project files, including requiring employees to enter into confidentiality agreements, training them, having them abide by a code of business conduct, using confidentiality designations in documents and emails, securing documents and project files, and the like. Moreover, you have produced documents in which individual defendants identified that such project files should not be disclosed. Your letter fails to identify what more you seek AMEC to provide. You and your client also well know that although thousands of documents were taken, there were not thousands of varying levels of efforts to maintain the secrecy of each of those documents; rather, prophylactic measures were put in place to prevent the retention of almost every document taken not the least of which were the employment agreements signed by all your individual clients prohibiting the very acts now at issue. Nevertheless, AMEC has detailed numerous other security efforts and those responses more than suffice.

Peter H. Bales, Esq.
Re:  *AMEC v. Geosyntec et al.*
June 10, 2013
Page 4

      Interrogatory No. 4 seeks for each document identified in the designation, AMEC to "identify every person at AMEC who was aware of its existence . . ."  AMEC has sufficiently responded to this interrogatory by identifying those individuals who would have had access to the project files for those projects and thus been aware of the existence.

      Interrogatory No. 5 seeks again for each document identified in the designation, AMEC to identify every person or government entity to whom it was disclosed.  Document Request Nos. 34-35 seek the same information. AMEC has produced a detailed Exhibit containing this information based on a detailed review of the documents and expenditures of many dozens of attorney hours in preparation of such.  In that chart, AMEC has disclosed those third parties to whom such documents were disclosed based on that review.  As to the responses to the interrogatory, such information is clearly more readily available to certain of the Individual Defendants who were the very individuals who oversaw the projects and took the documents.  As to the document requests, the interrogatory is unlimited in time and seeks every email on AMEC's servers in any way related to such documents.  Because AMEC already has expended considerable time and effort to disclose the clients, vendors, subcontractors and government entities to which such documents were disclosed, your stated request to somehow provide incrementally more of the same information smacks more of requiring AMEC to incur more unnecessary expense for dubious incremental value on a point of fact demonstrably within your clients' own direct knowledge.  Further, because we are dealing with documents almost entirely produced by defendants, such defendants can themselves have their own counsel expend the effort to determine if any more third party or governmental disclosures may be uncovered through means over which they likely have superior knowledge. With respect to Interrogatory No. 6, AMEC has described the harm it suffered due to the misappropriation of its trade secrets.  From your letter, you appear to want further information regarding damages, but you have not produced any information regarding revenue Geosyntec has made from these clients.  That information was requested and you simply did not provide it.  AMEC's damages—and the harm it suffered—may well be based on the extent to which Geosyntec was unjustly enriched by taking AMEC's clients and using its documents.  We understand defendants deny using the vast majority of the documents which AMEC has identified as trade secret protected; nevertheless, AMEC has requested and awaits approval by defendants on independent forensic review of all computers/electronic devices onto which AMEC's trade secret materials were transferred.  Such information likely will factor into AMEC's damages analysis with regard to its trade secret claims, but again this will be shaped by and the subject of expert testimony and is, to that extent, premature.  Moreover, to the extent you are seeking information on damages, such information will be the subject of expert reports and testimony, the dates

Peter H. Bales, Esq.
Re:  *AMEC v. Geosyntec et al.*
June 10, 2013
Page 5

for which have been set by the Court.  Similarly, although this is an interrogatory and not a document request, AMEC has already produced thousands of pages of invoices on the projects taken by defendants and intends to produce additional information in the course of discovery.

With respect to Document Request Nos. 38-42, AMEC is not willing to produce documents that constitute work product, but is willing to meet and confer to determine the specific documents you seek and to attempt to reach agreement as to the production of such documents.  As to a privilege log, we have stipulated that we will agree to a date for the mutual production of such logs on a date certain in the future.

We look forward to meeting and conferring with you on these issues and the issues raised in our letter concerning your discovery responses.

Sincerely,

Robert J. Nolan

cc:    Matthew F. Miller (via email)
       Richard C. Darwin (via email)

CBM-SF\SF589587

# EXHIBIT D

## Royce, Sharon

| | |
|---|---|
| **From:** | Bales, Peter |
| **Sent:** | Friday, June 14, 2013 11:17 AM |
| **To:** | Miller, Matthew F. (MMiller@cbmlaw.com); Nolan, Robert J. (rnolan@cbmlaw.com) |
| **Cc:** | Darwin, Richard C.; Gerace, Lucy |
| **Subject:** | Follow-up to June 11 Meet and Confer |

Rob and Matt,

As we discussed on June 11 during our in-person meet and confer, the parties would exchange emails confirming what issues remained from their respective meet and confer letters. In regards to the issues raised in my May 30 letter, I understand that AMEC has agreed to look into what documents, if any, AMEC will produce in response to Document Requests Nos. 38 through 42 to support its contention that the individual defendants "exceeded [their] authorized access to computer[s]…." If there are documents, please revise the responses to state which documents will be produced. If there are no documents, please revise the responses to confirm that.

The other discovery that AMEC agreed to look into further are the interrogatories and document requests regarding whether or not each designated trade secret was disclosed. (*See* Interrogatory No. 5, and Document Requests Nos. 34 and 35.) As I understand it, to date AMEC has only looked at the trade secret document itself (i.e. the bates numbered documents that AMEC identified as trade secrets) to determine whether it was disclosed and to who. AMEC has not looked anywhere else. We do not believe that satisfies AMEC's discovery obligations. You agreed to investigate what other sources exist that would show other instances of disclosure (i.e. client files, correspondence files, etc.) and whether or not AMEC would be willing to supplement its responses to this discovery. For those trade secrets where AMEC is unable to determine, after a reasonable investigation, whether it was disclosed to a government agency or third party, we would accept the following response where applicable: "AMEC is unable to determine, after a reasonable investigation, whether the subject trade secret was ever disclosed to a government agency or third party prior to the date AMEC contends it was misappropriated by defendants."

As for the remaining issues (Interrogatories Nos. 1-4, and 6), it is our understanding that AMEC will not further supplement or amend its responses.

Please let us know no later than Wednesday, June 19, whether AMEC will be supplementing its responses to any discovery and which ones so that we can determine the scope of the joint letter brief to Judge Beeler to resolve the remaining issues. As we agreed at the in-person meet and confer, the five day time period to submit the letter brief will not begin to run until the parties have finalized their meet and confer positions in writing.

Thank you,

Peter

*Peter Bales*
*Associate*
**BuchalterNemer**, A Professional Corporation
55 Second Street, Suite 1700 | San Francisco, CA 94105-3493
Direct Dial: (415) 227-3655 | Direct Fax: (415) 904-3121 | Switchboard: (415) 227-0900
Email: pbales@buchalter.com | www.buchalter.com | Bio

**Royce, Sharon**

| | |
|---|---|
| **From:** | Nolan, Robert J. <rnolan@cbmlaw.com> |
| **Sent:** | Wednesday, June 19, 2013 4:01 PM |
| **To:** | Bales, Peter; Miller, Matthew F. |
| **Cc:** | Darwin, Richard C.; Gerace, Lucy |
| **Subject:** | RE: Follow-up to June 11 Meet and Confer |

Peter,

Here is our response to your email, below.  Preliminarily, as discussed at the meet and confer, we understand that your clients were the project managers for the projects alleged in the designation.  They were required to file correspondence in AMEC's files and we will therefore pull the correspondence files for the applicable projects and provide a further response to the interrogatories and document requests associated with those projects based on the correspondence located in those files.  With respect to Interrogatories 1-4 and 6, we either do not understand what further information you seek and/or are unable to provide it due to the fact that the information does not exist in the form you are requesting it and/or the overbreadth and burdensome nature of the interrogatories as currently phrased.  With respect to Interrogatory No. 1, the trade secrets are compilations and/or other types of information.  As we have discussed in detail, the documents taken were project files and we have designated them by project and bates range.  We do not know what more you seek.  With respect to Interrogatory No. 2, we have provided a sufficient response.  To the extent you are seeking damages information on a document-by-document basis, AMEC's damages have not yet been so quantified; damages will be based on further discovery from defendants (which documents and information are in defendants' possession, custody and control); and damages will be the subject of expert testimony.  Expert reports are not due for some time.  We will provide such reports when due consistent with the Court's scheduling order.  With respect to Interrogatory No. 3, the documents identified primarily relate to three Arizona projects.  The hard copy files for those projects were located in Scottsdale and the electronic files would have been on the Scottsdale server with access limited to the AMEC employees in the Scottsdale office absent some specific request and authorization for some other individual outside of that office to review them.  For example, as you know from deposition, Joe Pisano reviewed the hard copy project files prior to their transfer after Travers and McNamara's departure at Dave Peterson's direction.  We will supplement our response to this interrogatory to so state.  With respect to Interrogatory No. 4, we have identified the relevant individuals in AMEC's response, and do not understand what more you seek.  With respect to Interrogatory No. 6, we have specified how AMEC has been harmed.  To the extent you are seeking damages information about each document in the designation, as stated above, AMEC's damages have not been fully quantified, will be based on further discovery from defendants, and will be the subject of expert testimony, and expert reports will be produced consistent with the Court's scheduling order when they are due.
Rob

Robert J. Nolan | Carroll, Burdick & McDonough LLP
44 Montgomery Street, Suite 400, San Francisco, CA 94104
Direct: (415) 743-2445
Cell: (415) 690-3263
rnolan@cbmlaw.com
www.cbmlaw.com

**From:** Bales, Peter [mailto:pbales@buchalter.com]
**Sent:** Friday, June 14, 2013 11:17 AM
**To:** Miller, Matthew F.; Nolan, Robert J.
**Cc:** Darwin, Richard C.; Gerace, Lucy
**Subject:** Follow-up to June 11 Meet and Confer

Rob and Matt,

As we discussed on June 11 during our in-person meet and confer, the parties would exchange emails confirming what issues remained from their respective meet and confer letters. In regards to the issues raised in my May 30 letter, I understand that AMEC has agreed to look into what documents, if any, AMEC will produce in response to Document Requests Nos. 38 through 42 to support its contention that the individual defendants "exceeded [their] authorized access to computer[s]..." If there are documents, please revise the responses to state which documents will be produced. If there are no documents, please revise the responses to confirm that.

The other discovery that AMEC agreed to look into further are the interrogatories and document requests regarding whether or not each designated trade secret was disclosed. (*See* Interrogatory No. 5, and Document Requests Nos. 34 and 35.) As I understand it, to date AMEC has only looked at the trade secret document itself (i.e. the bates numbered documents that AMEC identified as trade secrets) to determine whether it was disclosed and to who. AMEC has not looked anywhere else. We do not believe that satisfies AMEC's discovery obligations. You agreed to investigate what other sources exist that would show other instances of disclosure (i.e. client files, correspondence files, etc.) and whether or not AMEC would be willing to supplement its responses to this discovery. For those trade secrets where AMEC is unable to determine, after a reasonable investigation, whether it was disclosed to a government agency or third party, we would accept the following response where applicable: "AMEC is unable to determine, after a reasonable investigation, whether the subject trade secret was ever disclosed to a government agency or third party prior to the date AMEC contends it was misappropriated by defendants."

As for the remaining issues (Interrogatories Nos. 1-4, and 6), it is our understanding that AMEC will not further supplement or amend its responses.

Please let us know no later than Wednesday, June 19, whether AMEC will be supplementing its responses to any discovery and which ones so that we can determine the scope of the joint letter brief to Judge Beeler to resolve the remaining issues. As we agreed at the in-person meet and confer, the five day time period to submit the letter brief will not begin to run until the parties have finalized their meet and confer positions in writing.

Thank you,

Peter
*Peter Bales*
*Associate*
**BuchalterNemer**, A Professional Corporation
55 Second Street, Suite 1700 | San Francisco, CA 94105-3493
Direct Dial: (415) 227-3655 | Direct Fax: (415) 904-3121 | Switchboard: (415) 227-0900
Email: pbales@buchalter.com | www.buchalter.com | Bio

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure:** In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.